UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE ENGELMAYER

15 CV 1476

————————————————— x

RICHARD ZINNO, Individually and on Behalf :
of All Others Similarly Situated,       :
                                        :
                        Plaintiff,      :
                                        :
        vs.                             :
                                        :
CTPARTNERS EXECUTIVE SEARCH INC., :
BRIAN M. SULLIVAN and WILLIAM J.        :
KENEALLY,                               :
                                        :
                        Defendants.     :
                                        :
————————————————— x

Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS



DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by CTPartners Executive Search Inc. ("CTPartners" or the "Company"), as well as media and analyst reports about the Company and Company press releases. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all purchasers of CTPartners common stock between February 26, 2014 and January 28, 2015, inclusive (the "Class Period"), against CTPartners and certain of its officers and/or directors (the "Defendants") for violations of the Securities Exchange Act of 1934 ("1934 Act").

2.     Defendant CTPartners provides retained executive search services. CTPartners facilitates the recruitment and hiring of "C-level" executives, other senior executives and board members. The Company relies heavily on its reputation and the skills and qualifications of its search consultants to develop connections with business clients and executive recruits. For example, CTPartners' Code of Conduct states: "CTPartners' reputation for honesty and integrity is among our most important assets." Similarly, the Company's Form 10-K for the year ended December 31, 2013 states: "We believe the high caliber, extensive experience and motivation of our professionals are critical factors to our success."

3.     During the Class Period, Defendants repeatedly highlighted the Company's reputation within the industries in which it operated based on the "integrity" of its employees and on the

strength and qualifications of its search consultants.  Further, the Company represented that these consultants were promoted based on "objective" and "transparent" criteria related to their merits, and that this purported meritocracy had been and would be a key to the Company's ongoing success. Defendants, however, failed to disclose that CTPartners operated as a "den of discrimination" that subjected employees to crude, improper and discriminatory practices, which threatened the Company's ability to raise capital, retain employees or successfully execute its core business functions.  As a result of Defendants' false statements, CTPartners common stock traded at artificially inflated prices during the Class Period, reaching a high of $23.15 per share on November 12, 2014.

4.      Then, on December 8, 2014, in an article entitled "Wall Street recruiters had boozy naked romps: complaint," *The New York Post* reported that an "explosive" complaint had been filed with the Equal Employment Opportunity Committee ("EEOC") by a former CTPartners employee. The complaint reportedly detailed CTPartners as "a den of discrimination where women are stripped of profitable accounts, held to a higher standard than their male colleagues and subjected to lewd behavior."  The article went on to describe a "booze-fueled naked romp held by a top partner" in which the Company's Chief Executive Officer ("CEO"), defendant Brian M. Sullivan ("Sullivan"), reportedly participated.  The article stated in pertinent part as follows:

> Brian Sullivan, the chairman at CTPartners Executive Search, ripped off his clothes along with other partners during a drunken party at his Florida home in May 2012, female employees allege in discrimination charges filed with the [EEOC].

> Sullivan and at least three other top executives shed their clothes, formed a rugby-like scrum and ran into the ocean, according to the complaint.

> The debauched night, which was corroborated by former workers who claim to be witnesses, is just one instance of alleged sexual impropriety at the global recruitment giant.

*             *             *

- 2 -

One female employee at CTPartners alleged Jeremy Robertson, who works in the firm's hedge fund practice, called himself "daddy" and said he wanted to spank her.

When she complained to Vice Chairman Burke St. John, he dismissed the matter due to a "language barrier," even though Robertson's first language is English, according to her statement in the EEOC complaint.

St. John also was accused of boorish behavior. He would call women into his Sixth Avenue office and talk about how the shadows on the buildings outside looked like "penises," the woman alleges.

\*       \*       \*

The allegations are part of a broader pattern of discrimination, the complaint alleges.

Women routinely were stripped of profitable accounts, which were handed to male colleagues. They also were held to a higher standard for performance and were let go even if they brought in more money than male counterparts, the complaint alleges.

The firm's New York office had more than a dozen different sexual-harassment complaints brought internally in 2012, according to one former employee.

5.     That same day, CTPartners abruptly withdrew a stock offering that had been announced *less than 24 hours earlier*.  The Company had planned to offer 702,703 shares of common stock and defendant Sullivan had planned to offer 404,767 of his personal CTPartners shares in the offering.

6.     As a result of these announcements, the price of CTPartners stock dropped $4.50 per share to close at $14.00 per share on December 8, 2014, a decline of 24% from the prior closing price on volume of over 400,000 shares.

7.     On January 21, 2015, CTPartners announced its preliminary fourth quarter and full fiscal year 2014 financial results.  The Company announced preliminary adjusted earnings per share ("EPS") for the quarter of $0.06 to $0.08 per share, which came in well below the Company's original guidance of adjusted EPS of $0.19 to $0.21 per share.  CTPartners blamed the miss on over

$1.3 million in purportedly unanticipated expenses related to increased management, administrative and business development costs.

8.    On this news, the price of CTPartners stock dropped $3.63 per share to close at $8.87 per share on January 22, 2015, a one-day decline of more than 29% on volume of over 900,000 shares.  Analysts downgraded the stock, with one analyst dropping coverage and stating "it is going to take a while for the company to regain credibility with investors."

9.    Then, on January 28, 2015, the Company withdrew its preliminary fourth quarter and year-end guidance provided only *one week* earlier and revised downward its earnings guidance for the first quarter and full fiscal year 2015.  The Company disclosed that it expected to post a fourth quarter adjusted EPS *loss* of $0.07 to $0.09 per share, down from the prior announced adjusted EPS gain of $0.06 to $0.08 per share.  The Company stated that the downward revision was due to a $1.7 million increase in "compensation expense" for employee bonuses.  In addition, CTPartners *again* withdrew a proposed stock offering, this one announced only two days prior.

10.    On this news, the price of CTPartners stock dropped $2.17 per share to close at $4.35 per share on January 29, 2015, a one-day decline of more than 33% on volume of over 2.1 million shares.

## JURISDICTION AND VENUE

11.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

13.    Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of

materially false and misleading information, occurred in substantial part in this District and CTPartners' executive offices are in this District.

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NYSE stock market.

## PARTIES

15.     Plaintiff Richard Zinno acquired CTPartners common stock during the Class Period as set forth in the attached certification which is incorporated herein by reference and has been damaged thereby.

16.     Defendant CTPartners provides retained executive search services and maintains its headquarters at 1166 Avenue of the Americas, 3rd Floor, New York, New York  10036.

17.     Defendant Sullivan is, and at all relevant times was, the Chairman of the CTPartners Board of Directors and CTPartners' CEO.

18.     Defendant William J. Keneally ("Keneally") is, and at all relevant times was, the Company's Chief Financial Officer ("CFO").

19.     The defendants referenced above in ¶¶17-18 are referred to herein as the "Individual." The Individual Defendants made, or caused to be made, false statements that caused the price of CTPartners common stock to be artificially inflated during the Class Period.

20.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of CTPartners' quarterly reports, shareholder letters, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their

positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

21.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about CTPartners. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of CTPartners common stock was a success, as it: (i) deceived the investing public regarding CTPartners' business and operations; (ii) artificially inflated the price of CTPartners common stock; and (iii) caused plaintiff and other members of the Class to purchase CTPartners common stock at artificially inflated prices.

## BACKGROUND

22.     CTPartners provides retained executive search services worldwide. The Company facilitates the recruitment and hiring of "C-level" executives, such as CEOs, CFOs, chief legal officers, chief marketing officers, and chief human resource officers, as well as other senior executives and board members. The Company also offers board advisory services. CTPartners primarily serves various industry practice groups, including financial services, professional services, life sciences, technology/media/telecom, consumer/retail, and industrial.

23.     Given the nature of the Company's services, which depend on personal connections, insider knowledge and industry access, CTPartners relies heavily on its reputation and the qualifications and ability of its search consultants. For example, the Company lists among its "key competitive strengths" its search consultant compensation structure and collaborative firm culture:

- . . . Our performance-based business philosophy and incentive compensation structure is designed to focus our executive search consultants and other employees on successfully making the placements for which we are retained

within our stated goal of 100 days from our engagement. We believe this is a very important factor in satisfying our clients that in turn enables us to win follow-on business from these clients and further establish our reputation to win business from new clients.

*     *     *

- ***Organization and Incentives Structured to Drive Collaboration and Best Outcomes for the Client.*** Our compensation structure and one-firm culture motivates our executive search consultants to source the team they believe is best-suited for each situation and drives them to deliver results for the client. We believe this creates a strong team culture, with all members of the team aligned with the goal of quickly making a successful placement.

As of January 21, 2015, the Company employed 159 search consultants and provided services through 44 offices in 24 countries throughout the Americas, Europe, the Middle East, Asia and Australia.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

24.     The Class Period begins on February 26, 2014.  On that day, defendant Sullivan presented on the Company and its business to investors, analysts and the media at the Robert W. Baird Business Solutions Conference.  Defendant Sullivan focused his comments on the quality of the Company's search services, which Sullivan claimed improved the client experience and generated repeat business.  In particular, Sullivan said he was "mostly proud" of the Company's ability to attract and retain its critical search consultants, stating in pertinent part as follows:

What I am mostly proud of is, we have the lowest voluntary turnover in the industry. We lose between one and three people per year and that's usually either to get out of the search business or to go in with the client.

Now, we have more terminations than that as we're weeding out underperformers and topgrading.  However, voluntary turnover, which is truly a significant metric in any professional services business, is one where we are not affected.  And part of it is we do a very good job of screening people when they come in.

- 7 -

25.     Defendant Sullivan continued by highlighting how the "collaborative" and "trustworthy" culture instilled in the Company's search consultants generated business for the Company and improved the perception of the Company among its clientele, stating in pertinent part:

> The consultants that we have are all very strong individuals and they are even stronger as a team and this is a team that collaborates unbelievably well. We had a branding firm go out and this is going to be a new video that hits our website, which we are re-doing now. We had a branding firm go out and talk to both clients and non-clients. And they had a roster of about 25 words, descriptors, if you will, and 100% of the people that they asked came back with trust, flexible and collaborative as defining attributes of CTPartners. It's really cool because it's often difficult to look at somebody and say you should trust me because this for sure says untrustworthy. So you've got to earn it and you've got to earn it every search.

26.     Finally, defendant Sullivan emphasized that the firm's compensation structure, which was purportedly built on "objective" and "transparent" criteria, contributed to the Company's ability to attract and retain its search consultants:

> The compensation structure that we have is completely transparent. It's a grid, it is unique to the industry. ***Everybody understands how they get paid, what they get paid and everybody appreciates that it is transparent and it is objective versus subjective***. It is a significant contributor to our voluntary turnover ratio being the lowest in the industry and that's just great.

27.     On March 12, 2014, the CTPartners issued a press release announcing its fourth quarter and fiscal 2013 year-end results and providing guidance for the first quarter of fiscal 2014. The press release quoted defendant Sullivan as stating that the Company's "'exceptional finish'" was "'driven by strong execution by our consultants and an increase in demand,'" which "'allowed CTPartners to exceed its financial expectations for the fourth quarter.'"

28.     On March 13, 2014, CTPartners hosted an earnings conference call for analysts, media representatives and investors to discuss the Company's financial results and prospects. Defendants Sullivan and Keneally participated on the call. Once again, defendant Sullivan emphasized CTPartners' "strong" employee culture, claiming that it reflected "performance quality and results orientation" and that it allowed the Company to attract and retain high quality search

consultants and maintain a voluntary turnover rate that was the "lowest in the industry." On the call, defendant Sullivan stated in pertinent part:

> We continue to attract and retain high quality experienced consultants who are game changers and are already contributing to our growth. We are particularly proud of our low voluntary turnover, which was one consultant in the fourth quarter and continuing to be the lowest in the industry.
>
> \*       \*       \*
>
> *Simply put, our consultants stay and new ones want to come here because of the CTPartners culture. The culture, which has leadership at the practice level and leadership throughout the organization, remains strong and those we add will complement our performance quality and results orientation.* If a search consultant enjoys the art of executive search they love CTPartners.
>
> We're running lean. We've promoted from within, so we have developed additional capacity at the principal rank, which enables us to execute very well in an improving market and also execute very profitably.
>
> The big hires we made in the second half have been integrated. The Augmentum acquisition is fully integrated. Our placement rate is high, and our partners feel every time they meet the client the potential searches are [salutes]. We're not cocky; we're just confident.

29.     On April 29, 2014, CTPartners filed a Schedule 14A proxy statement for the shareholder meeting to be held on June 18, 2014. The proxy statement incorporated the Company's Code of Business Conduct and Ethics ("Code of Conduct"), stating that the Company's Code of Conduct "*applies to all of its employees, including its Chief Executive Officer and its Chief Financial Officer*. The Code of Business Conduct and Ethics and all Committee charters are posted in the investor relations portion of the Company's website at www.ctnet.com."

30.     The Company's Code of Conduct, as incorporated by the proxy statement, highlighted that CTPartners' "reputation for honesty and integrity" and its "goodwill" built up from years of ethical and trustworthy conduct were among the Company's "most important assets." The Code of Conduct also stated that Company employees were required to act "in all circumstances with honesty and integrity and in conformity with all applicable laws and regulations," with the

"highest standards of honesty and ethical conduct," and to "preserve and enhance the Company's reputation." The Code of Conduct stated in pertinent part:

> ***CTPartners' reputation for honesty and integrity is among our most important assets***. The CTPartners Code of Business Conduct and Ethics, which may be referred to as the "Code," is designed to provide you with a clear understanding of the conduct we expect from all our employees, directors and consultants. The Code applies to all directors, officers and employees of CTPartners and its subsidiaries, who, unless otherwise specified, are referred to together in the Code as "employees."

*     *     *

> We have adopted and implemented the Code to deter wrongdoing and promote the following:

> - Honest and ethical conduct, including (i) the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; (ii) the ethical conduct of our business; and (iii) the ethical management of our relationships and transactions with customers, vendors and anyone with whom we conduct business.

*     *     *

> - Compliance with applicable governmental laws, rules and regulations.

> - Prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code.

> - Accountability for adherence to the Code.

*     *     *

> The most important principal embodied in the Code is that as an employee of CTPartners, you are our representative, and ***you must act on behalf of CTPartners in all circumstances with honesty and integrity and in conformity with all applicable laws and regulations***.

*     *     *

> Employees and directors are expected to read the policies set forth in this Code and ensure that they understand and comply with them. . . . Employees and directors who violate this Code will be subject to disciplinary action, which may include a termination of employment.

*     *     *

*The Company expects all employees and directors to act with the highest standards of honesty and ethical conduct.* The Company considers honest conduct to be conduct that is free from fraud or deception and is characterized by integrity. The Company considers ethical conduct to be conduct conforming to accepted professional standards of conduct.

\*     \*     \*

Employees must act in a manner that creates value for the Company's clients and helps to build a relationship based upon trust. *The Company and its employees have provided executive search services for many years and have built up significant goodwill over that time. This goodwill is one of our most important assets, and Company employees must act to preserve and enhance the Company's reputation.*

31.     On May 8, 2014, CTPartners issued a press release announcing its first quarter 2014 results and providing guidance for the second quarter of fiscal 2014.  The press release announced "record high" net revenue for the Company of $39.9 million.  Defendant Sullivan commented on the announcement, stating in pertinent part as follows:

> "We are pleased to report that the strong momentum established in last year's second half accelerated in the first quarter of 2014. . . .  As we enter the traditionally strong second quarter and progress through the year we anticipate our investments in adding high quality talent and acquisitions across the globe in growing practice areas, such as industrial, energy and professional services will further contribute to the increased financial results we expect in 2014 and beyond . . . ."

32.     On May 9, 2014, CTPartners hosted an earnings conference call for analysts, media representatives and investors to discuss the Company's financial results and prospects.  Defendants Sullivan and Keneally participated on the call.  Defendant Sullivan once again emphasized the objective standards the Company purportedly used to evaluate search consultants, claiming that "[w]e have a performance based culture at CTPartners" and that this focus on objective search results was the "primary reason" the Company was able to "attract and . . . keep our consultants."  Defendant Sullivan stated in pertinent part:

> We continue to attract and retain high quality, experienced consultants. Our results clearly demonstrate that they are already contributing to our improved performance. We are particularly proud of our low voluntary turnover in the first

quarter, which, at three people, continues to be the lowest in the industry that we can see.

*We have a performance based culture at CTPartners*, as we've discussed. And it's the primary reason we attract and it's the primary reason we keep our consultants. Search is what we do and we do it better than anybody else. And we give our consultants the resources to be successful.

*      *      *

Well, our consultants here in CTPartners are hitting on all cylinders. They're the best search consultants in the industry. And it's my pleasure to work with them.

33.      On July 30, 2014, CTPartners issued a press release announcing its second quarter 2014 results and providing guidance for the third quarter of fiscal 2014. The Company announced "'yet another record performance,'" with quarterly net revenue of $45.1 million. Defendant Sullivan commented on the announcement, stating in pertinent part:

> "The increased productivity of our seasoned consultants and initial contributions of our more recent hires and acquisitions support our confidence that our strong financial performance will continue. We will continue to invest in building the CTPartners brand globally and seek out quality consultants in our existing practices to build shareholder value over the long term . . . ."

34.      On July 31, 2014, CTPartners hosted an earnings conference call for analysts, media representatives and investors to discuss the Company's financial results and prospects. Defendants Sullivan and Keneally participated on the call. Defendant Sullivan represented that the Company's hiring criteria was focused on "one thing, great search execution" and pointed to the attraction and retention of search consultants and their "trustworthy, collaborative, and flexible" reputation as critical to CTPartners' ongoing success. Defendant Sullivan stated in pertinent part:

> Each of [the Company's search consultants] fits our strategy of attracting high-producing experienced consultants who have a deep network of relationships and contacts in their respective fields. We ask them to do one thing, great search execution. That's why they join us and that's why they stay.

> Speaking of why they stay, our voluntary turnover record was less than 1% in the quarter – one person. We are finding that this continuity in working on assignments, from winning the assignment all the way through to placement is

critical in our business and it's one of the key reasons our clients keep coming back and it's a key reason our financial performance has been so strong over the last five quarters.

*     *     *

If there was one performance measurement that I had to identify is the key to the CTPartner success in the last quarter it has to be that 88% placement rate. I mean we've been tracking this number since 2005 and I don't recall a month that it's been that high never mind a quarter.

So, CTPartners is killing it. And this is also why we're so excited about this new branding, we are designed to deliver, in our clients own words we're trustworthy, collaborative, and flexible. Whatever is needed to get the job done for our clients we'll do it, if the client wins, we win.

35.     On August 5, 2014, CTPartners filed a Form S-3 registration statement for the sale of CTPartners common stock to the public. The registration statement was part of a "shelf" registration process designed to allow the Company to sell up to $50 million worth of its common stock on an ongoing basis. The shelf registration was also designed to allow defendant Sullivan to dump up to 404,767 shares of his personally held CTPartners stock at artificially inflated prices. The registration statement was declared effective on August 20, 2014.

36.     On November 5, 2014, CTPartners issued a press release announcing its third quarter 2014 results and providing guidance for the fourth quarter of fiscal 2014. The release quoted defendant Sullivan as stating that "'revenue grew 40% and adjusted [EPS] tripled over last year's, exceeding our guidance. This exceptional performance was driven by growth across each of our practice areas and geographic markets as our operating metrics strengthened . . . . As we move into the fourth quarter and look to 2015 we are increasingly optimistic that we will continue to successfully execute our growth strategy and drive shareholder value.'" The release also represented that fourth quarter adjusted EPS was expected to be between $0.19 and $0.21 per share.

37.     On November 6, 2014, CTPartners hosted an earnings conference call for analysts, media representatives and investors to discuss the Company's financial results and prospects.

Defendants Sullivan and Keneally participated on the call.   Defendant Sullivan once again highlighted the Company's purportedly objective "cultural values" centered on "executive search business" performance, which allowed the Company to "differentiate [itself] from [its] competitors for a prospective consultant."   Defendant Sullivan also stated that "the reputation of CTPartners" allowed it to quickly integrate new hires and expand its market share.   Defendant Sullivan stated in pertinent part:

> We're seeing stepped up production from the search consultants who joined our team during the year and prior and at the same time we lead the industry in maintaining a solid, steady base of consultants who fit very nicely in our culture which is the executive search business.
>
> So as we move into the fourth quarter and look to 2015, we're increasingly optimistic and encouraged that we will continue to grow and capture market share.
>
> *     *     *
>
> **I can tell you that we will not hire people who don't have the cultural values and the right orientation towards the way CTPartners does search.**
>
> However, we're being very aggressive because we see that in a modest economic environment, we're doing very, very well. It leads us to believe that the reputation of CTPartners and the outstanding performance that we provide for clients is becoming more and more well known, which enables people to ramp up more quickly than not.
>
> *     *     *
>
> Our ability to differentiate ourselves from our competitors for a prospective consultant is like night and day. I love having that conversation. And I can look anybody right in the eye and say if you love doing search there is no better platform in the business and I'm winning that conversation 90% of the time.

38.     The statements referenced above in ¶¶24-37 were materially false and misleading because they failed to disclose the following adverse information which was known to Defendants or recklessly disregarded by them:

- 14 -

(a)      that the Company had long standing employment discrimination issues that exposed the Company to the heightened risk that its reputation and ability to attract and retain search consultants would be significantly damaged;

(b)      that the Company was experiencing declining earnings due to increased business integration, administrative and management expenses that were outpacing revenue growth; and

(c)      that, based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its business and prospects.

39.      On December 8, 2014, CTPartners issued a press release announcing a public offering of CTPartners common stock pursuant to the shelf registration statement declared effective on August 20, 2014.  The release stated that the Company would be offering for sale 702,703 CTPartners common shares, while defendant Sullivan would be offering 404,767 shares.  The prospectus filed in connection with the stock offering stated that the proceeds received by the Company would be used for "general corporate purposes, which may include acquisitions."  The prospectus further stated that the Company would receive no proceeds from the sales by defendant Sullivan.

40.      That same day, *The New York Post*, in an article entitled "Wall Street recruiters had boozy naked romps: complaint," reported that an "explosive" complaint had been filed with the EEOC by a former CTPartners employee.  The complaint reportedly described CTPartners as "a den of discrimination where women are stripped of profitable accounts, held to a higher standard than their male colleagues and subjected to lewd behavior."  The article went on to describe a "booze-fueled naked romp held by a top partner" in which defendant Sullivan reportedly participated:

> Brian Sullivan, the chairman at CTPartners Executive Search, ripped off his
> clothes along with other partners during a drunken party at his Florida home in May

- 15 -

2012, female employees allege in discrimination charges filed with the Equal Employment Opportunity Committee.

Sullivan and at least three other top executives shed their clothes, formed a rugby-like scrum and ran into the ocean, according to the complaint.

The debauched night, which was corroborated by former workers who claim to be witnesses, is just one instance of alleged sexual impropriety at the global recruitment giant.

\*       \*       \*

One female employee at CTPartners alleged Jeremy Robertson, who works in the firm's hedge fund practice, called himself "daddy" and said he wanted to spank her.

When she complained to Vice Chairman Burke St. John, he dismissed the matter due to a "language barrier," even though Robertson's first language is English, according to her statement in the EEOC complaint.

St. John also was accused of boorish behavior. He would call women into his Sixth Avenue office and talk about how the shadows on the buildings outside looked like "penises," the woman alleges.

\*       \*       \*

The allegations are part of a broader pattern of discrimination, the complaint alleges.

Women routinely were stripped of profitable accounts, which were handed to male colleagues. They also were held to a higher standard for performance and were let go even if they brought in more money than male counterparts, the complaint alleges.

The firm's New York office had more than a dozen different sexual-harassment complaints brought internally in 2012, according to one former employee.

41.     Soon thereafter, the Company withdrew the stock offering that it had announced only earlier that day.

42.     As a result of this news, the price of CTPartners stock dropped $4.50 per share to close at $14.00 per share on December 8, 2014, a decline of 24% from the prior closing price on volume of over 400,000 shares.

43.     On January 14, 2015, *The New York Post* reported that an investor had asked the SEC to investigate whether the Company had withheld "vital information" related to the claims of sexual discrimination and improper conduct. The investors' complaint reportedly stated: "'The fact that the Corporation has failed to provide information about which it was aware as far back as 2012 shows a blatant disregard for the Corporation's current shareholders and the investing public in general . . . . That is information a current shareholder or potential future shareholder would want to know about in evaluating the Corporation stock and future prospects for investment purposes . . . . The sexual discrimination and harassment claims are important information that investors and potential investors in the Corporation's stock should be made aware of in evaluating their decision whether to invest in and/or retain their investment in the Corporation . . . .'"

44.     Then, on January 21, 2015, CTPartners announced its preliminary fourth quarter and full year 2014 financial results. The Company announced preliminary adjusted EPS for the quarter of $0.06 to $0.08 per share, which came in well below the Company's original guidance of adjusted EPS of $0.19 to $0.21 per share. CTPartners blamed the miss on over $1.3 million in purportedly unanticipated expenses related to increased management, administrative and business development costs.

45.     On this news, the price of CTPartners stock dropped $3.63 per share to close at $8.87 per share on January 22, 2015, a one-day decline of more than 29% on volume of over 900,000 shares. An analyst at William Blair downgraded the stock and dropped coverage of the Company, stating "we believe it is going to take a while for the company to regain credibility with investors . . . . We also do not view the stock as consistent with our focus on quality growth stocks, so we are dropping coverage."

46.     On January 26, 2015, CTPartners again announced that it would conduct a stock offering pursuant to the August 20, 2014 shelf registration statement, this time for up to $12.5 million worth of the Company's stock.  This time, the prospectus issued in connection with the offering stated that the proceeds would be used "for working capital and general corporate purposes," without mentioning acquisitions, which indicated a deterioration in the Company's cash position since the December 8, 2014 *New York Post* story.

47.     Then, on January 28, 2015, *one week* after CTPartners provided disappointing fourth quarter results, the Company withdrew its preliminary fourth quarter and year-end guidance and revised downward its earnings guidance for the first quarter and full fiscal year 2015.  The Company stated that it actually expected to post a fourth quarter adjusted EPS *loss* of $0.07 to $0.09 per share, down from the prior announced adjusted EPS gain of $0.06 to $0.08 per share.  The Company stated that the downward revision was due to a $1.7 million increase in "compensation expense" for employee bonuses.  In addition, CTPartners *once again* withdrew a proposed stock offering, pulling the January 26, 2015 offering.

48.     On this news, the price of CTPartners stock dropped $2.17 per share to close at $4.35 per share on January 29, 2015, a one-day decline of more than 33% on volume of over 2.1 million shares.  Another analyst, at Craig-Hallum Capital Group LLC, also suspended its coverage of the Company.

49.     On January 30, 2015, *The New York Post* reported on the stock slide in an article entitled "CTPartners sinks one day after announcing executive raises":

> Wall Street downsized CTPartners on Thursday – one day after the executive search firm announced it was giving its executives a raise.
>
> The New York company saw its stock drop 33.3 percent on Thursday after announcing $1.7 million in fourth-quarter bonuses and a revised profit guidance for the period that increased its expected net loss by 170 percent.

CTPartners, headed by Chairman and CEO Brian Sullivan, also withdrew its forecast for the first quarter and 2015 – while pulling a $12.5 million stock offering it announced just 48 hours earlier.

\*        \*        \*

CTPartners has said that the claims against it are without merit.

But for Sullivan, who has led the firm since 2004, alleged inappropriate behavior wasn't new, according to two former colleagues.

At a 2001 partners event in Barcelona, Spain, for example, while he was a vice chairman at a rival search firm, Heidrick & Struggles, Sullivan attempted to take off all his clothes on a bus en route to an afterparty, according to the two former employees.

Sullivan, who was a new father of twin girls at the time, yelled, "I'm going to show everyone my 'twin maker'!" the people said.

Even back on his wedding day, Sullivan's antics could have struck some as strange.

The CEO, in a photo seen by The Post, is handcuffed to his wife and is wearing an oversized lapel button that reads, "Life's a bitch and then you marry one."

50.     On February 5, 2015, *The New York Post*, in an article entitled "Troubled CTPartners gets takeover bid from rival recruiter," reported that CTPartners stock had lost so much of its value from the shocking revelations that it had become a takeover target by a rival executive search firm, DHR International ("DHR"):

Troubled Wall Street executive search firm CTPartners has received a $7-a-share takeover bid from a Chicago rival, The Post has learned.

DHR International, a 25-year-old firm with offices around the globe, sent the CTPartners board a letter Feb. 4 outlining its $61 million cash offer.

CTPartners has run into cash flow problems in recent weeks, sources said – and on Jan. 30 announced a $5 million private placement of shares with an unidentified investor.

\*        \*        \*

Hoffman [the chairman of DHR] made the offer verbally at the suggestion of Sullivan, he said.

"Just submit your offer to me verbally," Sullivan told Hoffman. "I hand-picked the board and they will do what I say."

                \*       \*       \*

The offer comes at a precipitous time for CTPartners.

Last week, it pulled a $12.5 million stock sale – its second aborted offering since December – and revised its fourth-quarter earnings guidance down because of an additional $1.7 million in fourth-quarter bonuses.

"*[The bonuses] fly in the face of the 75 percent loss for some shareholders*," Hoffman said, referring to the 71-point decline in CTPartners stock over the last three months.

"Usually you don't see those two things coincide," [he] said.

51.      As a result of Defendants' false statements, CTPartners common stock traded at artificially inflated prices during the Class Period. However, after the above revelations seeped into the market, the Company's common stock was hammered by massive sales, sending the Company's stock price down over 81% from its Class Period high and causing economic loss and damages to plaintiff and other members of the Class.

## LOSS CAUSATION/ECONOMIC LOSS

52.      During the Class Period, as detailed herein, Defendants made false and misleading statements by misrepresenting the Company's business and prospects and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of CTPartners common stock and operated as a fraud or deceit on Class Period purchasers of CTPartners common stock. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of CTPartners common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of CTPartners common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE
## AND FRAUD ON THE MARKET

53.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiff and other members of the Class purchased CTPartners common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

54.     At all relevant times, the market for CTPartners common stock was an efficient market for the following reasons, among others:

(a)     CTPartners stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, CTPartners filed periodic public reports with the SEC; and

(c)     CTPartners regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

- 21 -

**NO SAFE HARBOR**

55.     Defendants' false and misleading statements during the Class Period were not forward-looking statements ("FLS") and/or identified as such by Defendants, and thus did not fall within any "Safe Harbor."

56.     To the extent any false and misleading statements are determined to be FLS, CTPartners's verbal "Safe Harbor" warnings accompanying its oral FLS issued during the Class Period were ineffective to shield those statements from liability.

57.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of CTPartners who knew that the FLS was false.

58.     None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

**CLASS ACTION ALLEGATIONS**

59.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased CTPartners common stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

60.     The members of the Class are so numerous that joinder of all members is impracticable.  The stock is actively traded on the NYSE and there are over 7.2 million shares of CTPartners stock outstanding.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by CTPartners or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

61.     Common questions of law and fact predominate and include: (i) whether Defendants violated the 1934 Act; (ii) whether Defendants omitted and/or misrepresented material facts; (iii) whether Defendants knew or recklessly disregarded that their statements were false; and (iv) whether Defendants' statements and/or omissions artificially inflated the price of CTPartners common stock and the extent and appropriate measure of damages.

62.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

63.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

64.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

65.     Plaintiff incorporates all allegations in ¶¶1-64 above by reference.

66.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

67.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of CTPartners common stock during the Class Period.

68.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CTPartners common stock.  Plaintiff and the Class would not have purchased CTPartners common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

69.     As a direct and proximate result of Defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of CTPartners common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

70.     Plaintiff incorporates all allegations in ¶¶1-69 above by reference.

71.     The Individual Defendants acted as controlling persons of CTPartners within the meaning of §20(a) of the 1934 Act.  By virtue of their positions with the Company, and ownership of CTPartners stock, the Individual Defendants had the power and authority to cause CTPartners to engage in the wrongful conduct complained of herein.   CTPartners controlled the Individual Defendants and all of its employees.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding damages and interest;

C.     Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  February 27, 2015

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN

_____
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
bcochran@rgrdlaw.com

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
110 West A Street, Suite 750
San Diego, CA  92101
Telephone:  619/230-0063
619/255-1856 (fax)
frankj@johnsonandweaver.com

JOHNSON & WEAVER, LLP
W. SCOTT HOLLEMAN
99 Madison Avenue, 5th Floor
New York, NY  10016
Telephone:  212/802-1486
212/602-1592 (fax)
scotth@johnsonandweaver.com

Attorneys for Plaintiff

DocuSign Envelope ID: 2369EF8D-5701-44E0-9884-BD2F12DE1771

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Richard Zinno, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.  I have reviewed the complaint and authorize its filing.

2.  I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.  I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.  I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 10/8/2014 | 500 | $14.50 |
| 12/4/2014 | 100 | $17.85 |
| 12/4/2014 | 100 | $17.80 |
| 12/8/2014 | 525 | $17.00 |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| 12/2/2014 | 500 | $17.853 |
| 1/22/2015 | 200 | $7.8256 |

5.  I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

DocuSign Envelope ID: 2369EF8D-5701-44E0-9884-BD2F12DE1771

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 24th day of February 2015.

DocuSigned by:

Richard Zinno

BA308CC8A7B84C6...

Richard Zinno