UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

STEPHEN P. LOPEZ, Individually and on
Behalf of All Others Similarly Situated,

                    Plaintiff,

     vs.

CTPARTNERS EXECUTIVE SEARCH INC.,
BRIAN M. SULLIVAN AND WILLIAM J.
KENEALLY,

                  Defendants.

—————————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:15-cv-01476-PAE

CLASS ACTION

AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

DEMAND FOR JURY TRIAL

Lead Plaintiff Stephen P. Lopez ("Plaintiff"), individually and on behalf of all others similarly situated, by his undersigned attorneys, makes the allegations set forth herein based upon personal knowledge as to his own acts and upon the investigation conducted by Plaintiff's counsel. The investigation included, *inter alia*, a review of United States Securities and Exchange Commission ("SEC") filings by CTPartners Executive Search Inc. ("CTPartners" or the "Company"), media and analyst reports about the Company, Company press releases, and interviews with former CTPartners employees. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of CTPartners common stock between February 26, 2014 and January 28, 2015, inclusive (the "Class Period"), against CTPartners, Brian M. Sullivan ("Sullivan"), and William J. Keneally ("Keneally") (collectively, "Defendants") for violations of the Securities Exchange Act of 1934 ("Exchange Act").

2.      Defendant CTPartners provides retained executive search services. CTPartners facilitates the recruitment and hiring of "C-level" executives, other senior executives and board members. The Company relies heavily on its reputation and the skills and qualifications of its search consultants to develop connections with business clients and executive recruits. CTPartners' Code of Conduct states: "CTPartners' reputation for honesty and integrity is among our most important assets." Similarly, the Company's Form 10-K for the year ended December 31, 2013 states: "We believe the high caliber, extensive experience and motivation of our professionals are critical factors to our success."

3.      During the Class Period, Defendants repeatedly highlighted the Company's purported competitive advantage within the industries in which it operated based on the "integrity" of its employees, its cohesive work culture, and on the strength and qualifications of its search consultants.

Further, Defendants represented that these consultants were compensated and promoted based on "objective" and "transparent" criteria related to their merits, and that this purported meritocracy had been and would be a key to the Company's ongoing success.  Defendants repeatedly emphasized these core business attributes because they recognized that they were critical to CTPartners' business success in the executive search industry and perceived as such by investors and the market.  In truth, however, for years CTPartners engaged in a company-wide pattern and practice of sex discrimination, fostering a shockingly lewd and inappropriate work culture, and creating a hostile work environment diametrically opposed to Defendants' public statements.  This case is not about an isolated incident of sex discrimination.  By the start of the Class Period, CTPartners was beset by a culture of discrimination and sexual harassment, which numerous employees had complained about for years, and the Company's business was at risk should the truth about CTPartners come out.  As a result of Defendants' materially false and misleading statements and omissions, CTPartners common stock traded at artificially inflated prices during the Class Period, reaching a high of $23.15 per share on November 12, 2014.

4.      Then, on December 8, 2014, in an article entitled "Wall Street Recruiters Had Boozy Naked Romps: Complaint" (the "December 8th Article"), *The New York Post* reported that an "explosive" complaint had been filed with the U.S. Equal Employment Opportunity Commission ("EEOC") (the "EEOC Complaint") by a former CTPartners employee.  The complaint reportedly detailed CTPartners as "a den of discrimination where women are stripped of profitable accounts, held to a higher standard than their male colleagues and subjected to lewd behavior."  The article went on to describe a "booze-fueled naked romp held by a top partner" in which Defendant Sullivan, the Company's Chief Executive Officer ("CEO") and Chairman at the time, was the ring leader.  Describing the EEOC Complaint, the article stated in pertinent part as follows:

> Brian Sullivan, the chairman at CTPartners Executive Search, ripped off his clothes along with other partners during a drunken party at his Florida home in May 2012, female employees allege in discrimination charges filed with the [EEOC].

> Sullivan and at least three other top executives shed their clothes, formed a rugby-like scrum and ran into the ocean, according to the complaint.

> The debauched night, which was corroborated by former workers who claim to be witnesses, is just one instance of alleged sexual impropriety at the global recruitment giant.

5.     According to the December 8th Article, the EEOC Complaint was replete with additional examples of CTPartners' crude "boys' club" culture of sexual harassment, gender discrimination and the creation of a hostile work environment:

> One female employee at CTPartners alleged Jeremy Robertson, who works in the firm's hedge fund practice, called himself "daddy" and said he wanted to spank her.

> When she complained to Vice Chairman Burke St. John, he dismissed the matter due to a "language barrier," even though Robertson's first language is English, according to her statement in the EEOC complaint.

> St. John also was accused of boorish behavior. He would call women into his Sixth Avenue office and talk about how the shadows on the buildings outside looked like "penises," the woman alleges.

6.     The EEOC Complaint's allegations of lewd behavior and sexual harassment were further described in the December 8th Article as forming the backdrop of a broader pattern of the Company's discriminatory pay, work opportunity and promotion practices against women.  The EEOC Complaint was said to allege, in pertinent part, as follows:

> Women routinely were stripped of profitable accounts, which were handed to male colleagues. They also were held to a higher standard for performance and were let go even if they brought in more money than male counterparts, the complaint alleges.

> ***The firm's New York office had more than a dozen different sexual-harassment complaints brought internally in 2012***, according to one former employee.[1]

---

[1]     All emphasis is added unless otherwise noted.

7.      These and similar allegations of discriminatory, lewd and otherwise inappropriate conduct were corroborated by the investigation of Plaintiff's counsel, including interviews with several former CTPartners employees, as described further herein.

8.      Recognizing the impact that disclosure of the EEOC Complaint's allegations would have on the Company, Defendant Sullivan orchestrated a stock offering as soon as he found out that *The New York Post* was planning to publish its report about the EEOC Complaint so he could avoid suffering tremendous losses.

9.      CTPartners had been aware of *The New York Post's* intended story since at least Friday, December 5, 2014.  Before the market opened the following Monday, December 8, CTPartners announced that it planned to offer 702,703 shares of common stock, and Sullivan planned to offer 404,767 of his personal CTPartners shares in a public offering.  However, in the wake of *The New York Post's* disclosure of the EEOC Complaint, CTPartners abruptly withdrew the stock offering that had been announced less than 12 hours earlier.

10.      As a result of *The New York Post's* disclosure, the price of CTPartners stock plummeted $4.50 per share, from $18.50 per share to close at $14.00 per share on December 8, 2014, a decline of 24% from the prior closing price on volume traded of over 400,000 shares.  Instead of pocketing $7.5 million in proceeds had he sold his shares at the closing price on December 5, 2014, Sullivan personally lost $6.2 million in paper losses when CTPartners stock plunged on December 8.

11.      In response to *The New York Post's* report on the EEOC Complaint, CTPartners issued a press release acknowledging that a former employee had submitted a complaint to the EEOC.  Further, the Company said that the former employee had raised concerns of discrimination "earlier this year," and that the Company's chief operating officer ("COO") "undertook a comprehensive investigation, along with external counsel."  Based on that investigation, CTPartners

said it believes that the claim did not have merit.  However, the Company's response is belied by, *inter alia*, the highly suspicious and unusual stock sales by the COO who undertook that investigation.  ***In August 2014, David Nocifora ("Nocifora"), CTPartners' COO, sold 70% of his personally held CTPartners stock***.  Earlier that same month, CTPartners filed a Form S-3 registration statement ("Registration Statement") listing Defendant Sullivan as a selling shareholder. The Registration Statement laid the framework for Sullivan to later unload more than 400,000 of his personal shares of CTPartners stock.

12.     The December 8th Article was the first of three disclosures that revealed to the market the falsity of Defendants' misstatements and omissions.  As a result of these three disclosures, the price of CTPartners common stock collapsed, from $18.50 per share prior to the first disclosure, to a close of $4.35 per share on January 29, 2015.

13.     Since the close of the Class Period, the price of CTPartners' stock has continued its downward descent, closing at $2.20 per share on June 10, 2015, ***a decline of more than 90% from its Class Period high***.  Similarly, the Company's business performance has gone from bad to worse as the risk Defendants failed to disclose materialized.  Defendant Sullivan was fired as CEO, approximately 30 of the Company's search consultants have left the Company, revenues have plummeted by 12.5%, and the Company has been unable to meet certain covenants under its credit facility agreements, thereby threatening its very existence.  Cognizant of this existential threat, in early 2015, a special committee of CTPartners' board agreed to enter into exclusive negotiations to be acquired by a rival executive search firm, DHR International Inc. ("DHR International").

14.     The following chart summarizes the precipitous decline in the price of CTPartners common stock and the attempt by the Company's top executives to cash out before the truth became known to the market:



15.     As a result of Defendants' wrongful acts and omissions, Plaintiff and other Class members have suffered significant economic losses and damages.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

18.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).   Many of the acts charged herein, including the preparation and dissemination of

materially false and misleading information, occurred in substantial part in this District and CTPartners' executive offices are located in this District.

19.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NYSE stock market.

## PARTIES

20.     Plaintiff Stephen P. Lopez purchased CTPartners common stock during the Class Period, as set forth in the certification previously submitted to the Court and which is incorporated herein by reference, and has been damaged thereby.

21.     Defendant CTPartners provides retained executive search services and maintains its headquarters at 1166 Avenue of the Americas, 3rd Floor, New York, New York 10036.

22.     Defendant Sullivan was the Chairman and CEO of CTPartners from September 2004 until his termination by the Company effective April 2, 2015.

23.     Defendant Keneally is, and at all relevant times was, the Company's Chief Financial Officer ("CFO"), beginning in April 2013.

24.     The defendants referenced above in ¶¶22-23 are referred to herein as the "Individual Defendants."

25.     Defendants are liable for: (i) making false statements; and (ii) failing to disclose adverse facts known to them about CTPartners.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of CTPartners common stock was a success, as it: (i) deceived the investing public regarding CTPartners' business and operations; (ii) artificially inflated the price of CTPartners common stock; and (iii) caused Plaintiff and other members of the Class to purchase CTPartners common stock at artificially inflated prices.

26.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the Individual Defendants, by virtue of their high-level positions with the Company and/or control of the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.   Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

27.     As officers and controlling persons of a publicly held company whose shares were, and are, registered with the SEC pursuant to the Exchange Act, and were, and are, traded over the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded shares would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

28.     Because of their board membership and/or executive and managerial positions with the Company, each of the Individual Defendants had access to the adverse undisclosed information about CTPartners' business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about the Company and its business issued or adopted by the Company materially false and misleading.

29.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of CTPartners' quarterly reports, shareholder letters, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, and because of their direct and primary participation in the undisclosed discriminatory and lewd conduct described herein, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the misrepresentations contained therein.

**SUBSTANTIVE ALLEGATIONS**

**CTPartners' Reputation, Work Culture, and Treatment of Search Consultants Are Highly Material and Important to Its Business**

30.     Defendant CTPartners provides retained executive search services worldwide.  The Company facilitates the recruitment and hiring of "C-level" executives, such as CEOs, CFOs, chief

legal officers, chief marketing officers, and chief human resource officers, as well as other senior executives and board members.  CTPartners primarily serves various industry practice groups, including financial services, professional services, life sciences, technology/media/telecom, consumer/retail, and industrial.  As of December 31, 2014, the Company employed 157 executive search consultants and 474 other full-time employees, and provided services through 44 offices in 24 countries throughout the Americas, Europe, the Middle East, Asia and Australia.

31.     The executive search industry depends on personal connections, insider knowledge, and industry access.  It is axiomatic that "executive search is a reputation driven industry," as one analyst who covers CTPartners noted in a research report on the Company.

32.     The importance of reputation to executive search firms is borne out by empirical research.  In 2013, talentRISE, a firm specializing in management consulting to the recruiting industry, conducted a survey on recruitment trends that asked participants what is most important to them when selecting an executive search firm.  The results revealed that reputation, not industry or functional specialization, trumped all other reasons why one firm is selected over another.

33.     In an article discussing the survey results, Julie Melvin of talentRISE wrote, in pertinent part, as follows:

> **Reputation**. For those of us who make our living as executive search professionals, the survey results indicate that *a firm's reputation in the industry is paramount. In essence, that reputation depends on the cumulative reputation of* <u>all</u> *the individuals employed by that firm. In turn, the sum of all those individual reputations becomes* THE *brand in the market.* This response is an important reminder that *integrity* in how we deal with those who hire us, and the candidates we meet along the way, is critical to our success.
>
> For those readers considering hiring an executive search firm in the near future, you're fortunate to have many ways (including social media) to vet a firm's reputation, beyond asking for references from peers in HR at other companies and asking to speak to candidates who have worked with that firm.  It's time well spent considering that *you are entrusting your organization's brand to the search firm as they act on your behalf to source, interview and assess future employees*. (Emphasis in bold and italics added).

34.     Similarly, in "What Is the Secret to Selecting Top Executive Search Firms?", Krista Bradford, writing for *The Good Search*, noted that one of the prerequisites of an executive search firm as that "[t]hey must have a good reputation and a strong track record of success."  To winnow down the list of potential executive search firms from which to choose, she emphasized the importance of trust, stating in pertinent part as follows:

> You deserve an executive search partner you can trust.  While the retained search industry has long been a relationship driven business, these days corporate search buyers need more than a golf buddy or tennis partner.  You[] deserve an executive search firm that, in action and in word, demonstrates it is to be trusted.

35.     Given the nature of the Company's services, CTPartners relies heavily on its reputation and its ability to retain and appropriately reward top search consultants and repeatedly emphasized the importance of these attributes to investors.  For example, the Company lists among its "key competitive strengths" its search consultant compensation structure and collaborative firm culture:

- . . . Our performance-based business philosophy and incentive compensation structure is designed to focus our executive search consultants and other employees on successfully making the placements for which we are retained within our stated goal of 100 days from our engagement.  We believe this is a very important factor in satisfying our clients that in turn enables us to win follow-on business from these clients and further establish our reputation to win business from new clients.

                    *        *        *

- ***Organization and Incentives Structured to Drive Collaboration and Best Outcomes for the Client***.  Our compensation structure and one-firm culture motivates our executive search consultants to source the team they believe is best-suited for each situation and drives them to deliver results for the client. We believe this creates a strong team culture, with all members of the team aligned with the goal of quickly making a successful placement.

36.     Indeed, as far back as 2007, CTPartners vice chairman Peter Metzger ("Metzger") publicly acknowledged the impact that poor judgment by executives can have on a company and its

shareholders.[2]  In an interview with CNBC, Metzger (sitting as a representative of CTPartners) was asked whether "embarrassing acts by corporate leaders and executives truly create a crisis of confidence among the public and investors."  Metzger responded as follows:

> [T]he need to get information out quickly, accurately, and correctly is absolutely paramount.  I agree with the earlier statements that CEOs take on a rock star quality.  They have to accept responsibility to the visibility they have and anything that even sniffs of a cover-up is unacceptable behavior.

The interviewer continued by asking Metzger whether he believed that CEO misconduct could also "impact shareholders," to which Metzger responded that "it has a very definite negative impact," stating as follows:

> [P]erhaps what we're talking about . . . is the fact that we're really talking about executives' judgment.  These are judgments that are made under extreme circumstances and reflect the ability to make other judgments that could affect the business.  And I think it has a very definite negative impact and shareholders and boards should both take note.

In other words, Metzger agreed that when an executive's judgment is poor, it casts doubt on that executive's ability to make wise business-related decisions that could negatively impact shareholders.

### CTPartners Operated as a "Den of Discrimination" Towards Women

37.     For years leading up to the Class Period, CTPartners fostered a pattern and practice of sexual discrimination and a hostile work environment characterized by crude, inappropriate and lewd acts by its most senior executives.  Women were routinely denied equal pay for equal work, passed over for promotions, fired without cause and penalized for seeking maternity leave.  In addition, female employees were forced to endure a "boys club" work environment that tolerated and encouraged male nudity, offensive and abusive language, and libidinous behavior by male supervisors towards their female subordinates.  These were not "one off" or isolated incidents, but a

---

[2]     At the time, CTPartners was known by its former name, Christian & Timbers.

pattern and practice that permeated, and in many respects defined, the work culture at CTPartners and stemmed from the very top of the organization on down.

38.     In the December 8th Article, *The New York Post* reported that the EEOC Complaint was filed by a former CTPartners employee.  The EEOC Complaint described CTPartners as "a den of discrimination."  *The New York Post*, which obtained a copy of the EEOC Complaint and had spoken to numerous former employees of CTPartners, reported that, according to a former employee, CTPartners' New York office had more than a dozen different sexual-harassment complaints brought internally in 2012.

39.     According to *The New York Post*, the EEOC is investigating these allegations.  The newspaper said they were made by one female former employee and backed up in the EEOC Complaint by a second former employee.  *The New York Post* also stated that its own discussions with former CTPartners' employees had corroborated information in the EEOC complaint.

40.     *The New York Post* also reported that a former executive assistant to CTPartners Vice Chairman Burke St. John ("St. John") was told that she would have to work for less senior executives after she returned from maternity leave because of the "baby thing," according to Company emails.  In fact, St. John and Patricia Kissane, the executive assistant to Defendant Sullivan who served as an office manager, appeared to be aware of the insensitive nature of the move they were about to make as they agreed to carry it out without alerting the human resources office, as documented in an email between the two that was partially quoted in *The New York Post* article.  In the new position, the assistant's overtime was limited, causing her annual compensation to be cut by $10,000.  The assistant, whose name was withheld because she is afraid of retaliation, left CTPartners 14 months after returning from maternity leave.  She claims she left, in part, because of what she felt was a bias at CTPartners against women.

- 13 -

41.     As part of their investigation into the facts underlying this action, counsel for Plaintiff interviewed a former partner at CTPartners ("Former Employee No. 1" or "FE1"), who served in that capacity until 2012. FE1's statements, along with those of additional former employees discussed herein, reinforce the strong inference of scienter and the materiality of the misstatements and omissions raised by, *inter alia*, the EEOC Complaint's allegations, the reporting of *The New York Post*, the suspicious nature and timing of insider stock sales, and the fact that the Individual Defendants and other top executives directly participated in the discriminatory and inappropriate misconduct alleged herein.

42.     FE1 said one of the compelling reasons for originally joining the Company was because she was told that 50% of the partners were women and it was a very female-friendly environment. But in reality, she learned that there were a number of male partners who had no qualms about using derogatory terms to refer to women and making lewd jokes in the office. According to FE1, she and other women were discriminated against when it came to compensation. FE1 estimates that she was cheated out of hundreds of thousands of dollars in compensation she rightfully earned.

43.     FE1 explained how partners at the Company were compensated via "splits." According to FE1, partners were given a percentage of the Company's fee on a job search on a sliding scale. Partners were eligible for 30% of the Company's total fee on a job search.

44.     FE1 stated that there were three components to how partners "split" the 30% bonus on any given search:

(a)     Business development, or marketing, accounted for 20% of the bonus. This essentially meant that the partner who handled this aspect was the initial contact with the client;

(b)     Giving the pitch to the client accounted for 30% of the bonus; and

(c)      Performing the execution on the search accounted for 50% of the bonus.  The splits were designed so that execution was the most important component.

45.      According to FE1, 30% was the starting point; the percentage of the fee paid to partners increased as the partners' sales increased.  FE1 said that this was another way women were bilked out of bonuses, as it was harder for women to achieve the required levels to receive increased bonus percentages and volume bonuses.

46.      According to FE1, when more than one partner worked on a search, the splits referenced in ¶44(b)-(c) above were to be divided between those partners based on participation.  CTPartners claimed internally and externally that it was known for great execution and that the split amounts supported this.  However, certain practice leaders were known for taking a percent of the execution from female partners when they did no work.  When female partners reporting to them were instructed to do all the execution of searches with two or more partners, this practice stood in the way of the female partners doing more business development – another way of negatively impacting the female partners' earnings.

47.      FE1 reported to one of CTPartners' managing partners (the "Managing Partner").  The Managing Partner had FE1 do all the execution on the majority of the searches they worked on together, but he typically took a portion of the execution credit regardless.  According to FE1, this was very common in all of CTPartners' practices.  As a result, there were many women who were inhibited from earning what they were entitled to.  FE1 said that the fee split was determined every time a search was opened with another partner, but a number of the practice leaders were known to take the lion's share of the fee and there was nothing that could be done about it.  Toward the end of her employment at CTPartners, FE1 opened a search with another male partner, who "did not

practice any of this nonsense," but the Managing Partner chastised her for not giving him more of a split even though he had nothing to do with the search whatsoever.

48.     FE1 said that, in general, the Managing Partner would make the initial calls, but she would do *all* of the execution on the vast majority of searches.  The Managing Partner would ordinarily just make an appearance on a search update call while reading a newspaper, and even make disparaging comments about FE1 *to the client during the call*.  When it came time to do the legwork on the searches, FE1 said she did the entire execution on the majority of the searches she did with the Managing Partner.  Yet FE1 typically got no more than 40% of the bonus, although she typically deserved 65%.  FE1 said very few women received their rightful share of what they had earned.

49.     FE1 added that there was another man in her practice who was junior to her, yet the Managing Partner would allow the junior man to dictate how he would work with FE1, even though she was his superior.

50.     FE1 said that she complained to Glory DeSimone, a human resources personnel, in 2010 or 2011 about how she was being mistreated by the Managing Partner and how she was being squeezed out of her splits and not being paid correctly.  However, FE1 said "it was very clear that you really couldn't say anything about the splits" and the general atmosphere because "a huge number of the senior people participated in it.  It was understood that it was going to fall on deaf ears."  FE1 was told by a woman who was a vice chairman at the Company (as well as very good friends with Defendant Sullivan), that she should not discuss this with Sullivan because he was "not going to do anything about" the Managing Partner, and "it's going to be wasting your breath if you talk to Brian about it."

- 16 -

51.     According to FE1, the Managing Partner frequently charged non-business expenses to the Company.  Specifically, he told one of his previous administrative assistants to put personal expenses related to her appearance on corporate expense accounts.  The Managing Partner actually used FE1's expense account for his own expenses.  FE1 made the Company's finance department aware of this; in response, the finance department said the Managing Partner could do whatever he wanted.

52.     Unfair treatment of women was not limited to the Managing Partner.  FE1 said that it was "common knowledge that women in St. John's practice were not always fairly compensated for their work and that large accounts opened by women did not necessarily remain their accounts exclusively."  The same was also true of Wes Richards, who used to take the lion's share of two other female partners' searches even though he had little or no participation in the search.

53.     FE1 stated that she left CTPartners because she was not being fairly compensated for the work she was doing and wanted to get out from under the Managing Partner's thumb.  She kept complaining to him that she was not being compensated fairly, and he kept promising to make things right, but he never did.  When she proposed to the Managing Partner that they cease the so-called 50-50 relationship and split fees based on the corporate fee structure in the spirit in which it was originally intended, he refused to do so.

54.     Counsel for Plaintiff also interviewed another former partner at CTPartners ("Former Employee No. 2" or "FE2"), who served in that capacity from 2011 to 2012.  FE2 was aware of the December 8, 2014 article in *The New York Post*, and actually said the story was "under-reported."  She said that CTPartners was "clearly a boys club" where "women were treated differently" than men.  ***FE2 said she was the thirteenth woman over forty years old who was let go from the Company in the previous eighteen months***, and she was not paid on searches she had already

performed.  Specifically, FE2 stated that she was not paid on a search for asset manager Brevan Howard when she was paired with Jeremy Robertson ("Robertson"), another managing partner. According to FE2, St. John awarded Robertson full payment on all the searches even though FE2 introduced Brevan Howard to seven hires; FE2 was paid on only one.  When she contested this, FE2 was "unceremoniously let go" a couple months later without being paid more than $500,000 in commissions owed to her.

57.     FE2 further stated that two other female partners were fired after two down years due to a market correction, even though they had carried the Company for a couple of years, billing over $3 million per year.  FE2 said this is exactly what the Company did to her.

56.     FE2 said that there were a lot of women let go from the Company, but very few people resigned.  She added that there were men who had not billed in two or three years yet were not let go, whereas women who had billed $300,000 to $500,000 were let go and denied commissions.

57.     Counsel for Plaintiff interviewed a third former partner ("Former Employee No. 3" or "FE3").  To the best of FE3's recollection, when she began her work with CTPartners in early 2011 there were approximately ten to twelve female partners in the New York office.  By the time she left, approximately three years later, and to the best of her recollection, the number of female partners had been reduced by half.  According to FE3, most of the female partners who left were women over forty.

58.     In addition, counsel for Plaintiff interviewed a former research associate in the Global Human Resources and Diversity and Inclusion Practices group at CTPartners ("Former Employee No. 4" or "FE4"), who served in that capacity from 2011 to 2013 under partner Dan Kaplan

("Kaplan").  Prior to her position as a research associate, FE4 worked as a "temp" from late 2010 until early 2011.

59.     According to FE4, accounts were being taken from female partners and handed over to male partners.  Payoffs were then made to female partners when they left the firm to maintain their silence about the work environment and sex discrimination.

60.     FE4 herself observed the "boys club" nature of the Company.  She said she was passed over for a position she wanted but was tasked with interviewing and then hiring a young gentleman, despite her trepidations.  She was then asked to monitor and supervise him with no pay increase or promotion.  FE4 added that the same opportunities were not made available to women as they were to men.

61.     FE4 also provided additional evidence that women who took maternity leave were disadvantaged at the Company.  FE4 left the Company because Kaplan refused to work with her to arrange her schedule when she came back from maternity leave.  She said it was never resolved, and she left CTPartners.

62.     Counsel for Plaintiff also spoke with a former executive assistant ("Former Employee No. 5" or "FE5"), who served in that capacity from January through August 2014.  FE5 described CTPartners as a "boys club" and stated that she was not aware of any women receiving promotions during her tenure but was aware of men receiving promotions.

**A Culture of Sexual Harassment Permeated CTPartners**

63.     Not surprisingly, CTPartners' compensation discrimination against women took place in the context of a work environment permeated by sexual harassment where women were subjected to lewd behavior and a hostile work environment.  For example, as reported in the December 8th Article, the EEOC Complaint described a "booze-fueled naked romp held by a top partner" in which defendant Sullivan reportedly participated:

Brian Sullivan, the chairman at CTPartners Executive Search, ripped off his clothes along with other partners during a drunken party at his Florida home in May 2012, female employees allege in discrimination charges filed with the Equal Employment Opportunity Committee [*sic*].

Sullivan and at least three other top executives shed their clothes, formed a rugby-like scrum and ran into the ocean, according to the complaint.

64. Indeed, the drunken party was not an extracurricular event: it took place at Sullivan's home at the end of a partner meeting. Moreover, FE2 stated she had witnessed the naked ocean run and that the naked run was a "ritual" that Sullivan and "her bosses" did "in front of everyone" at the yearly global partner meeting. She said that partners from all over the world were in attendance. FE2 also stated that Company partners, including Defendant Sullivan, were known to attend strip clubs following Company events and expense those trips to corporate accounts. She was invited to attend one of the strip club outings, but declined. Further, FE4 had heard about the "naked romp" in the office before reading about it in the newspaper. She said it "was talked about openly."

65. The debauched night in 2012, which was also corroborated by four former CTPartners workers who claim to be witnesses in the EEOC Complaint, is just one instance of alleged sexual impropriety at the global recruitment giant. According to the December 8th Article, the EEOC Complaint is replete with additional allegations that form a broader pattern of discrimination against women and is consistent with the investigations of Plaintiff's counsel.

66. For example, FE5 stated that CTPartners was an "abusive" and "hostile" work environment for women. Further, as the December 8th Article reported, the EEOC Complaint alleged as follows:

One female employee at CTPartners alleged Jeremy Robertson, who works in the firm's hedge fund practice, called himself "daddy" and said he wanted to spank her.

When she complained to Vice Chairman Burke St. John, he dismissed the matter due to a "language barrier," even though Robertson's first language is English, according to her statement in the EEOC complaint.

St. John also was accused of boorish behavior.  He would call women into his Sixth Avenue office and talk about how the shadows on the buildings outside looked like "penises," the woman alleges.

67.     Allegations of Sullivan's lewd behavior even pre-date his time at CTPartners, which he has led since 2004.  According to two former employees, and as reported in *The New York Post*, in 2001, while he was a vice chairman at a rival search firm, Heidrick & Struggles, Sullivan attempted to take off all his clothes on a bus en route to an afterparty at a partners event in Barcelona, Spain.

68.     In a press release issued on December 8, 2014, CTPartners said it was aware that a complaint by a former employee has been submitted to the EEOC.  A Company spokesperson confirmed to the industry publication *Recruiter* that CTPartners and the woman who filed the complaint had agreed to mediate the dispute.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS MADE DURING THE CLASS PERIOD

### I.     Robert W. Baird Business Solutions Conference

69.     The Class Period begins on February 26, 2014.  On that day, Defendant Sullivan presented on the Company and its business to investors, analysts and the media at the Robert W. Baird Business Solutions Conference.  Defendant Sullivan focused his comments on the quality of the Company's search services, which he claimed improved the client experience and generated repeat business.  In particular, Sullivan emphasized that the firm's compensation structure, which was purportedly built on "objective" and "transparent" criteria, contributed to the Company's ability to attract and retain its search consultants:

> ***The compensation structure that we have is completely transparent***.  It's a grid, it is unique to the industry.  ***Everybody understands how they get paid, what they get paid and everybody appreciates that it is transparent and it is objective versus subjective***.  It is a significant contributor to our voluntary turnover ratio being the lowest in the industry and that's just great.

**Falsity of Statements Made During Robert W. Baird Business Solutions Conference**

70.     The statements above in ¶69 were materially false and misleading at the time they were made, and omitted material information required to be disclosed, because they failed to disclose the following adverse information that was known to Defendants or recklessly disregarded by them:

         (a)     that the Company had a long-standing practice of employment discrimination against women and had created a hostile work environment that exposed the Company to the heightened risk that its reputation and ability to attract and retain search consultants would be significantly damaged; and

         (b)     that the Company's compensation structure was not completely transparent to female employees; female employees did not understand how they would get paid or what they would get paid; and the compensation structure was highly subjective and discriminatory against women, instead of being objective.

**Defendants' Contemporaneous Knowledge or Reckless Disregard for the Falsity of Statements Made During Robert W. Baird Business Solutions Conference**

71.     The following facts, viewed holistically together with all of the facts alleged herein, establish Defendants' scienter with respect to the false statements contained in ¶69:

         (a)     Defendant Sullivan was the driving force behind the Company's culture of sexual harassment and lewd and inappropriate behavior;

         (b)     senior management was directly engaged in discriminatory compensation practices against female employees; and

         (c)     the Company's human resources department received numerous reports of sexual discrimination.

**II.     4Q13 & Fiscal Year 2013 Form 10-K and Earnings Call**

72.     On March 12, 2014, CTPartners filed its financial report on Form 10-K for the fiscal quarter and year ended December 31, 2013 with the SEC, which was signed by Defendant Sullivan and Defendant Keneally.  The Form 10-K stated that the Company's compensation and promotional practices were fair, transparent, merits-based and critical to the Company's success, stating in pertinent part as follows:

> ***We believe the high caliber, extensive experience and motivation of our professionals are critical factors to our success.  We utilize a combination of base salary, revenue and volume bonuses, discretionary bonuses and equity compensation to compensate our employees***.
>
> Our associates and researchers support the efforts of our executive search consultants with candidate sourcing and identification by making initial contact with candidates and performing other search-related functions.  We train our associates and researchers, as well as new executive search consultants, in the use of our proprietary retained executive search process and communication systems.  Additionally, we periodically hold training and development programs for our associates and researchers.  As a result of our strong development culture, we have made a significant number of internal promotions.  Over the past five years, we have promoted twenty-one associates to executive search consultant.  ***Promotion to executive search consultant is based on a variety of factors, including demonstrated superior execution and business development skills, the ability to identify solutions to complex issues, personal and professional ethics, a thorough understanding of the market and the ability to develop and build effective teams***.
>
> We believe we have been able to attract and retain some of the most productive executive search consultants with previous search backgrounds and strong specialty expertise.  ***We consider relations with our employees to be good.***

73.     On March 13, 2014, CTPartners hosted an earnings conference call for analysts, media representatives and investors to discuss the Company's financial results and operations.  Defendants Sullivan and Keneally participated on the call.  Sullivan emphasized CTPartners' "strong" employee culture, claiming that it reflected "performance quality and results orientation" and that it allowed the Company to attract and retain high quality search consultants and maintain a

voluntary turnover rate that was the "lowest in the industry."  During the conference call, Defendant

Sullivan stated in pertinent part:

> We continue to attract and retain high quality experienced consultants who are game changers and are already contributing to our growth. ***We are particularly proud of our low voluntary turnover, which was one consultant in the fourth quarter and continuing to be the lowest in the industry***.

> \*        \*        \*

> ***Simply put, our consultants stay and new ones want to come here because of the CTPartners culture. The culture, which has leadership at the practice level and leadership throughout the organization, remains strong and those we add will complement our performance quality and results orientation***.  If a search consultant enjoys the art of executive search they love CTPartners.

> We're running lean. We've promoted from within, so we have developed additional capacity at the principal rank, which enables us to execute very well in an improving market and also execute very profitably.

> The big hires we made in the second half have been integrated. The Augmentum acquisition is fully integrated. Our placement rate is high, and our partners feel every time they meet the client the potential searches are [salutes]. We're not cocky; we're just confident.

**Falsity of Statements Made in 4Q13 & Fiscal Year 2013 Form 10-K and Earnings Call**

74.     The statements above in ¶¶72-73 were materially false and misleading at the time

they were made, and omitted material information required to be disclosed, because they failed to

disclose the following adverse information that was known to Defendants or recklessly disregarded

by them:

(a)     that the Company had a long-standing practice of employment discrimination

against women and had created a hostile work environment that exposed the Company to the

heightened risk that its reputation and ability to attract and retain search consultants would be

significantly damaged;

(b)     that Sullivan's statements about voluntary turnover omitted material facts concerning the Company's pattern and practice of firing female partners and employees, which facts were necessary in order to make such statements not misleading;

(c)     that the Company's culture, which included institutionalized discrimination against female employees, did not help attract and retain female consultants; and

(d)     to the extent these statements were opinions or beliefs, they lacked a reasonable basis and omitted the facts stated in (a)-(c) above which were necessary to make these opinions or beliefs not misleading in the context in which they were made.

75.     In addition, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303"), required the Form 10-K to "[d]escribe any known trends or uncertainties that have or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations."   The regulation also required the Form 10-K to disclose events that the registrant knew would "cause a material change in the relationship between costs and revenues."  *Id*.  The true nature of the Company's systemic discriminatory practices and its creation of a hostile work environment was required to be disclosed in the Form 10-K pursuant to Item 303 because it was an uncertainty that would (and did) have an unfavorable impact on CTPartners' sales, revenues and income from operations.

**Defendants' Contemporaneous Knowledge or Reckless Disregard for the Falsity of Statements Made in 4Q13 & Fiscal Year 2013 Form 10-K and Earnings Call**

76.     The following facts, viewed holistically together with all of the facts alleged herein, establish Defendants' scienter with respect to the false statements contained in ¶¶72-73:

(a)     Defendant Sullivan was the driving force behind the Company's culture of sexual harassment and lewd and inappropriate behavior;

- 25 -

(b)      senior management was directly engaged in discriminatory compensation practices against female employees; and

(c)      the Company's human resources department received numerous reports of sexual discrimination.

### III.      2014 Schedule 14A Proxy Statement

77.      On April 29, 2014, CTPartners filed a Schedule 14A proxy statement for the shareholder meeting to be held on June 18, 2014 (the "Proxy Statement").  The Proxy Statement incorporated the Company's Code of Business Conduct and Ethics ("Code of Conduct"), stating that the Company's Code of Conduct "*applies to all of its employees, including its Chief Executive Officer and its Chief Financial Officer*.  The Code of Business Conduct and Ethics and all Committee charters are posted in the investor relations portion of the Company's website at www.ctnet.com."

78.      The Company's Code of Conduct, as incorporated by the Proxy Statement, highlighted that CTPartners' "reputation for honesty and integrity" and its "goodwill" built up from years of ethical and trustworthy conduct were among the Company's "most important assets."  The Code of Conduct also stated that Company employees were required to act "in all circumstances with honesty and integrity and in conformity with all applicable laws and regulations," with the "highest standards of honesty and ethical conduct," and to "preserve and enhance the Company's reputation."  The Code of Conduct stated in pertinent part as follows:

> *CTPartners' reputation for honesty and integrity is among our most important assets*.  The CTPartners Code of Business Conduct and Ethics, which may be referred to as the "Code," is designed to provide you with a clear understanding of *the conduct we expect from all our employees, directors and consultants*.  The Code applies to all directors, officers and employees of CTPartners and its subsidiaries, who, unless otherwise specified, are referred to together in the Code as "employees."

*      *      *

We have adopted and implemented the Code to deter wrongdoing and promote the following:

- Honest and ethical conduct, including (i) the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; (ii) the ethical conduct of our business; and (iii) the ethical management of our relationships and transactions with customers, vendors and anyone with whom we conduct business.

*     *     *

- Compliance with applicable governmental laws, rules and regulations.

- Prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code.

- Accountability for adherence to the Code.

*     *     *

The most important principal embodied in the Code is that as an employee of CTPartners, you are our representative, and *you must act on behalf of CTPartners in all circumstances with honesty and integrity and in conformity with all applicable laws and regulations*.

*     *     *

Employees and directors are expected to read the policies set forth in this Code and ensure that they understand and comply with them. . . .  Employees and directors who violate this Code will be subject to disciplinary action, which may include a termination of employment.

*     *     *

*The Company expects all employees and directors to act with the highest standards of honesty and ethical conduct*.  The Company considers honest conduct to be conduct that is free from fraud or deception and is characterized by integrity. The Company considers ethical conduct to be conduct conforming to accepted professional standards of conduct.

*     *     *

Employees must act in a manner that creates value for the Company's clients and helps to build a relationship based upon trust.  *The Company and its employees have provided executive search services for many years and have built up significant goodwill over that time.  This goodwill is one of our most important assets, and Company employees must act to preserve and enhance the Company's reputation*.

- 27 -

**Falsity of Statements Made in 2014 Schedule 14A Proxy Statement**

79.     The statements above in ¶¶77-78 were materially false and misleading at the time they were made, and omitted material information required to be disclosed, because they failed to disclose the following adverse information that was known to Defendants or recklessly disregarded by them:

(a)     that the Company had a long-standing practice of employment discrimination against women and had created a hostile work environment that exposed the Company to the heightened risk that its reputation and ability to attract and retain search consultants would be significantly damaged; and

(b)     that the CEO and other top executives had engaged in lewd and inappropriate behavior including but not limited to stripping naked at official Company events and making derogatory and abusive comments to female employees that would irrevocably tarnish CTPartners' reputation and substantially impair its "goodwill" if it were exposed;

(c)     that the Company did not enforce the portions of the Code of Conduct highlighted above; and

(d)     to the extent these statements were opinions or beliefs, they lacked a reasonable basis and omitted the facts stated in (a)-(c) above which were necessary to make these opinions or beliefs not misleading in the context in which they were made.

**Defendants' Contemporaneous Knowledge or Reckless Disregard for the Falsity of Statements Made in 2014 Schedule 14A Proxy Statement**

80.     The following facts, viewed holistically together with all of the facts alleged herein, establish Defendants' scienter with respect to the false statements contained in ¶¶77-78:

(a)     Defendant Sullivan was the driving force behind the Company's culture of sexual harassment and lewd and inappropriate behavior;

(b)      senior management was directly engaged in discriminatory compensation practices against female employees; and

(c)      the Company's human resources department received numerous reports of sexual discrimination.

## IV.      1Q14 Form 10-Q and Earnings Call

81.      On May 8, 2014, CTPartners filed its financial report on Form 10-Q for the fiscal quarter ended March 31, 2014 with the SEC, which was signed by Defendant Keneally.

82.      On May 9, 2014, CTPartners hosted an earnings conference call for analysts, media representatives and investors to discuss the Company's financial results and prospects.  Defendants Sullivan and Keneally participated on the call.  Defendant Sullivan once again emphasized the objective standards the Company purportedly used to evaluate search consultants, claiming that "[w]e have a performance based culture at CTPartners" and that this focus on objective search results was the "primary reason" the Company was able to "attract and . . . keep our consultants." Defendant Sullivan stated in pertinent part:

> ***We continue to attract and retain high quality, experienced consultants****.* Our results clearly demonstrate that they are already contributing to our improved performance.  ***We are particularly proud of our low voluntary turnover in the first quarter, which, at three people, continues to be the lowest in the industry that we can see****.*
>
> ***We have a performance based culture at CTPartners, as we've discussed. And it's the primary reason we attract and it's the primary reason we keep our consultants****.*  Search is what we do and we do it better than anybody else. And we give our consultants the resources to be successful.

### Falsity of Statements Made in 1Q14 Form 10-Q and Earnings Call

83.      The statements above in ¶¶81-82 were materially false and misleading at the time they were made, and omitted material information required to be disclosed, because they failed to

disclose the following adverse information that was known to Defendants or recklessly disregarded by them:

(a)     that the Company had a long-standing practice of employment discrimination against women and had created a hostile work environment that exposed the Company to the heightened risk that its reputation and ability to attract and retain search consultants would be significantly damaged;

(b)     that Sullivan's statements about voluntary turnover omitted material facts concerning the Company's pattern and practice of firing female partners and employees, which facts were necessary in order to make such statements not misleading;

(c)     that the Company's culture, which included institutionalized discrimination against female employees, did not help attract and retain female consultants;

(d)     to the extent these statements were opinions or beliefs, they lacked a reasonable basis and omitted the facts stated in (a)-(c) above which were necessary to make these opinions or beliefs not misleading in the context in which they were made.

84.     In addition, the true nature of the Company's systemic discriminatory practices and its creation of a hostile work environment was required to be disclosed in the Form 10-Q pursuant to Item 303 because it was an uncertainty that would (and did) have an unfavorable impact on CTPartners' sales, revenues and income from operations.

**Defendants' Contemporaneous Knowledge or Reckless Disregard for the Falsity of Statements Made in 1Q14 Form 10-Q and Earnings Call**

85.     The following facts, viewed holistically together with all of the facts alleged herein, establish Defendants' scienter with respect to the false statements contained in ¶¶81-82:

(a)     Defendant Sullivan was the driving force behind the Company's culture of sexual harassment and lewd and inappropriate behavior;

(b)      senior management was directly engaged in discriminatory compensation practices against female employees; and

(c)      the Company's human resources department received numerous reports of sexual discrimination.

## V.      June 23, 2014 Press Release

86.      On June 23, 2014, CTPartners issued a press release entitled "CTPartners Launches New Brand Identity."  In the press release, CTPartners highlighted its "renewed commitment to accountability and transparency in the marketplace," and stated that this accountability and transparency offered it a competitive advantage in the marketplace.  The press release stated in pertinent part:

> CTPartners (NYSE MKT: CTP), a leading global retained executive search firm today launched a new brand identity *to mark the firm's renewed commitment to accountability and transparency in the marketplace*.
>
> The launch for *Designed to Deliver* includes a full website redesign (www.ctnet.com); a new logo and tagline; and the development of new communications materials to reflect the new identity.
>
> Brian Sullivan CEO said, "*Designed to Deliver* embodies the business philosophy of CTPartners, putting clients first and realizing that by focusing on the priorities of our clients, a win-win scenario will evolve.
>
> "*Our transparency and accountability creates trust, our one global P/L philosophy creates best team collaboration*, and our propriety technology enables us to be flexible to changing business environments.  All of this fuels our relentless focus on client priorities and defines CTPartners as the quality leader in the executive search industry.  We realize that if our clients succeed, we will succeed.  Therefore, CTPartners is Designed to Deliver."

### Falsity of Statements Made in June 23, 2014 Press Release

87.      The statements above in ¶86 were materially false and misleading at the time they were made, and omitted material information required to be disclosed, because they failed to

disclose the following adverse information that was known to Defendants or recklessly disregarded by them:

(a)     that the Company had a long-standing practice of employment discrimination against women and had created a hostile work environment that exposed the Company to the heightened risk that its reputation and ability to attract and retain search consultants would be significantly damaged;

(b)     that Defendants' statements about "accountability" and "transparency" omitted material facts concerning the Company's pattern and practice of mistreating women and creating a work environment diametrically opposed to the representations made to investors and failure to follow-up on and hold accountable employees who engaged in discriminatory, lewd or hostile work conduct;

(c)     that far from creating "best team collaboration" through the Company's purportedly merits-based compensation structure, CTPartners unfairly, subjectively and discriminatorily compensated, promoted and otherwise incentivized its employees; and

(d)     to the extent these statements were opinions or beliefs, they lacked a reasonable basis and omitted the facts stated in (a)-(c) above which were necessary to make these opinions or beliefs not misleading in the context in which they were made.

### Defendants' Contemporaneous Knowledge or Reckless Disregard for the Falsity of Statements Made in June 23, 2014 Press Release

88.     The following facts, viewed holistically together with all of the facts alleged herein, establish Defendants' scienter with respect to the false statements contained in ¶86:

(a)     Defendant Sullivan was the driving force behind the Company's culture of sexual harassment and lewd and inappropriate behavior;

(b)      senior management was directly engaged in discriminatory compensation practices against female employees; and

(c)      the Company's human resources department received numerous reports of sexual discrimination.

## VI.      2Q14 Form 10-Q and Earnings Call

89.      On July 30, 2014, CTPartners filed its financial report on Form 10-Q for the fiscal quarter ended June 30, 2014 with the SEC, which was signed by Defendant Keneally.

90.      On July 31, 2014, CTPartners hosted an earnings conference call for analysts, media representatives and investors to discuss the Company's financial results and operations.  Defendants Sullivan and Keneally participated on the call.  Defendant Sullivan represented that the Company's hiring criteria was focused on "one thing, great search execution" and pointed to the attraction and retention of search consultants and their "trustworthy, collaborative, and flexible" reputation as critical to CTPartners' ongoing success.  Defendant Sullivan stated in pertinent part:

> Each of [the Company's search consultants] fits our strategy of attracting high-producing experienced consultants who have a deep network of relationships and contacts in their respective fields. We ask them to do one thing, great search execution. That's why they join us and that's why they stay.
>
> ***Speaking of why they stay, our voluntary turnover record was less than 1% in the quarter – one person***. We are finding that this continuity in working on assignments, from winning the assignment all the way through to placement is critical in our business and it's one of the key reasons our clients keep coming back and it's a key reason our financial performance has been so strong over the last five quarters.

### Falsity of Statements Made in 2Q14 Form 10-Q and Earnings Call

91.      The statements above in ¶¶89-90 were materially false and misleading at the time they were made, and omitted material information required to be disclosed, because they failed to disclose the following adverse information that was known to Defendants or recklessly disregarded by them:

- 33 -

(a)     that the Company had a long-standing practice of employment discrimination against women and had created a hostile work environment that exposed the Company to the heightened risk that its reputation and ability to attract and retain search consultants would be significantly damaged;

(b)     that Sullivan's statements about voluntary turnover omitted material facts concerning the Company's pattern and practice of firing female partners and employees, which facts were necessary in order to make such statements not misleading; and

(c)     that to the extent these statements were opinions or beliefs, they lacked a reasonable basis and omitted the facts stated in (a)-(b) above which were necessary to make these opinions or beliefs not misleading in the context in which they were made.

92.     In addition, the true nature of the Company's systemic discriminatory practices and its creation of a hostile work environment was required to be disclosed in the Form 10-Q pursuant to Item 303 because it was an uncertainty that would (and did) have an unfavorable impact on CTPartners' sales, revenues and income from operations.

**Defendants' Contemporaneous Knowledge or Reckless Disregard for the Falsity of Statements Made in 2Q14 Form 10-Q and Earnings Call**

93.     The following facts, viewed holistically together with all of the facts alleged herein, establish Defendants' scienter with respect to the false statements contained in ¶¶89-90:

(a)     Defendant Sullivan was the driving force behind the Company's culture of sexual harassment and lewd and inappropriate behavior;

(b)     senior management was directly engaged in discriminatory compensation practices against female employees; and

(c)     the Company's human resources department received numerous reports of sexual discrimination.

94.     On August 5, 2014, CTPartners filed a Form S-3 registration statement for the sale of CTPartners common stock to the public.  The Registration Statement was part of a "shelf" registration process designed to allow the Company to sell up to $50 million worth of its common stock on an ongoing basis.  The shelf registration was also expressly designed to allow Defendant Sullivan to sell up to 404,767 shares of his personally held CTPartners stock.  The registration statement was declared effective on August 20, 2014.

95.     Also in August 2014, CTPartners COO, David Nocifora – the same COO who had purportedly conducted a "comprehensive investigation" of the EEOC allegations – began a massive insider selling spree, ultimately selling 70% of his personal stockholdings in the Company for $3 million in proceeds by the end of the month as detailed herein.

## VII.    3Q14 Form 10-Q and Earnings Call

96.     On November 6, 2014, CTPartners hosted an earnings conference call for analysts, media representatives and investors to discuss the Company's financial results and operations. Defendants Sullivan and Keneally participated on the call.  Defendant Sullivan once again highlighted the Company's purportedly objective "cultural values" centered on "executive search business" performance, which allowed the Company to "differentiate [itself] from [its] competitors for a prospective consultant."  Defendant Sullivan also stated that "the reputation of CTPartners" allowed it to quickly integrate new hires and expand its market share.  Defendant Sullivan stated in pertinent part as follows:

> We're seeing stepped up production from the search consultants who joined our team during the year and prior and at the same time ***we lead the industry in maintaining a solid, steady base of consultants*** who fit very nicely in our culture which is the executive search business.
>
> So as we move into the fourth quarter and look to 2015, we're increasingly optimistic and encouraged that we will continue to grow and capture market share.

*      *      *

> *I can tell you that we will not hire people who don't have the cultural values and the right orientation towards the way CTPartners does search.*

However, we're being very aggressive because we see that in a modest economic environment, we're doing very, very well. It leads us to believe that the reputation of CTPartners and the outstanding performance that we provide for clients is becoming more and more well known, which enables people to ramp up more quickly than not.

*       *       *

Our ability to differentiate ourselves from our competitors for a prospective consultant is like night and day. I love having that conversation. And I can look anybody right in the eye and say if you love doing search there is no better platform in the business and I'm winning that conversation 90% of the time.

97.     On November 7, 2014, CTPartners filed its financial report on Form 10-Q for the fiscal quarter ended September 30, 2014 with the SEC, which was signed by Defendant Keneally.

### Falsity of Statements Made in 3Q14 Form 10-Q and Earnings Call

98.     The statements referenced above in ¶¶96-97 were materially false and misleading because they failed to disclose the following adverse information which was known to Defendants or recklessly disregarded by them:

(a)     that the Company had a long-standing practice of employment discrimination against women and had created a hostile work environment that exposed the Company to the heightened risk that its reputation and ability to attract and retain search consultants would be significantly damaged;

(b)     that Sullivan's statements about "a steady base of consultants" omitted material facts concerning the Company's pattern and practice of firing female partners and employees, which facts were necessary in order to make such statements not misleading;

(c)     that the Company's culture, which included institutionalized discrimination against female employees, did not help attract and retain female consultants; and

- 36 -

(d)     to the extent these statements were opinions or beliefs, they lacked a reasonable basis and omitted the facts stated in (a)-(c) above which were necessary to make these opinions or beliefs not misleading in the context in which they were made.

99.     In addition, the true nature of the Company's systemic discriminatory practices and its creation of a hostile work environment was required to be disclosed in the Form 10-Q pursuant to Item 303 because it was an uncertainty that would (and did) have an unfavorable impact on CTPartners' sales, revenues and income from operations.

**Defendants' Contemporaneous Knowledge or Reckless Disregard for the Falsity of Statements Made in 3Q14 Form 10-Q and Earnings Call**

100.     The following facts, viewed holistically together with all of the facts alleged herein, establish Defendants' scienter with respect to the false statements contained in ¶¶96-97:

(a)     Defendant Sullivan was the driving force behind the Company's culture of sexual harassment and lewd and inappropriate behavior;

(b)     senior management was directly engaged in discriminatory compensation practices against female employees;

(c)     the Company's human resources department received numerous reports of sexual discrimination;

(d)     on information and belief, after learning of the concerns of the employee who filed the EEOC Complaint, the Company filed a Form S-3 registration statement for the sale of CTPartners common stock to the public, which was designed to allow Defendant Sullivan to dump up to 404,767 shares of his personally held CTPartners stock at artificially inflated prices; and

(e)     on information and belief, after the Company's COO personally undertook a comprehensive investigation of the concerns of the employee who filed the EEOC Complaint, he sold 70% of his personal CTPartners stock.

**VIII.   December 8, 2014 Preliminary Prospectus and Press Release**

101.   On December 8, 2014, CTPartners issued a press release announcing that it had commenced a public offering of CTPartners common stock pursuant to the shelf registration statement declared effective on August 20, 2014.  The release stated that the Company would be offering for sale 702,703 CTPartners common shares, while defendant Sullivan would be offering 404,767 shares.

102.   The preliminary prospectus ("Preliminary Prospectus") filed in connection with the stock offering stated that the proceeds received by the Company would be used for "general corporate purposes, which may include acquisitions."  The Preliminary Prospectus further stated that the Company would receive no proceeds from the sales made by Defendant Sullivan.  Further, the Preliminary Prospectus discussed CTPartners' compensation structure, stating in pertinent part as follows:

> We believe our key competitive strengths are:
>
> ***Intense Focus on the Timely and Successful Completion of Searches.*** Our performance-based business philosophy and incentive compensation structure is designed to focus our executive search consultants and other employees on successfully making the placements for which we are retained within our stated goal of 100 days from our engagement. We believe this is a very important factor in satisfying our clients that in turn enables us to win follow-on business from these clients and further establish our reputation to win business from new clients.
>
> \*   \*   \*
>
> ***Organization and Incentives Structured to Drive Collaboration and Best Outcomes for the Client***. Our compensation structure and one-firm culture motivates our executive search consultants to source the team they believe is best-suited for each situation and drives them to deliver results for the client. We believe this creates a strong team culture, with all members of the team aligned with the goal of quickly making a successful placement.

**Falsity of Statements Made in the December 8, 2014 Preliminary Prospectus and Press Release**

103.     The statements referenced above in ¶¶101-102 were materially false and misleading because they failed to disclose the following adverse information which was known to Defendants or recklessly disregarded by them:

(a)     that the Company had a long-standing practice of employment discrimination against women and had created a hostile work environment that exposed the Company to the heightened risk that its reputation and ability to attract and retain search consultants would be significantly damaged;

(b)     that the Company's statements about its compensation structure omitted material facts concerning the Company's pattern and practice of unfairly, subjectively and discriminatorily compensating, promoting and otherwise incentivizing its employees, which facts were necessary in order to make such statements not misleading;

(c)     that the Company's culture, which included institutionalized discrimination against female employees, did not help attract and retain female consultants;

(d)     to the extent these statements were opinions or beliefs, they lacked a reasonable basis and omitted the facts stated in (a)-(c) above which were necessary to make these opinions or beliefs not misleading in the context in which they were made.

104.     In addition, the true nature of the Company's systemic discriminatory practices and its creation of a hostile work environment was required to be disclosed in the Preliminary Prospectus pursuant to Item 303 because it was an uncertainty that would (and did) have an unfavorable impact on CTPartners' sales, revenues and income from operations.

**Defendants' Contemporaneous Knowledge or Reckless Disregard for the Falsity of Statements Made in the December 8, 2014 Preliminary Prospectus and Press Release**

105.    The following facts, viewed holistically together with all of the facts alleged herein, establish Defendants' scienter with respect to the false statements contained in ¶¶101-102:

(a)    Defendant Sullivan was the driving force behind the Company's culture of sexual harassment and lewd and inappropriate behavior;

(b)    senior management was directly engaged in discriminatory compensation practices against female employees;

(c)    the Company's human resources department received numerous reports of sexual discrimination;

(d)    on information and belief, after learning of the concerns of the employee who filed the EEOC Complaint, the Company filed a Form S-3 registration statement for the sale of CTPartners common stock to the public, which was designed to allow Defendant Sullivan to dump up to 404,767 shares of his personally held CTPartners stock at artificially inflated prices;

(e)    on information and belief, after learning that *The New York Post* was planning to disclose details concerning the EEOC Complaint, the Company filed the Preliminary Prospectus, which was designed to allow Defendant Sullivan to dump up to 404,767 shares of his personally held CTPartners stock at artificially inflated prices; and

(f)    on information and belief, after the Company's COO personally undertook a comprehensive investigation of the concerns of the employee who filed the EEOC Complaint, he sold 70% of his personal CTPartners stock.

106.    Also on December 8, 2014, the December 8th Article was published.

107.    Soon thereafter, the Company withdrew the stock offering that it had announced only earlier that day.

108.    According to *The New York Post*, CTPartners had been aware of the newspaper's impending story since the previous Friday, December 5.

109.    On December 8, 2014, after the publication of the December 8th Article and the withdrawal of the stock offering, the price of CTPartners stock dropped $4.50 per share to close at $14.00 per share on December 8, 2014, a decline of 24% from the prior closing price on abnormally high volume of over 400,000 shares.

## IX.    December 8, 2014 Press Release

110.    Despite the publication of the December 8th Article, the price of CTPartners stock remained artificially inflated because the market had not yet learned the extent of the Company's widespread culture of discriminatory, hostile and inappropriate conduct or the risk that this conduct posed to CTPartners' business and operations.  In addition, that same day CTPartners issued a press release denying the allegations in the EEOC complaint and stating that it had acted quickly and appropriately once it learned of the complaint, which served to halt any further stock price decline and maintain the artificial inflation.  The Company's press release stated in pertinent part:

> *CTPartners takes all allegations of discrimination very seriously.  As soon as the firm was informed of concerns by an employee earlier this year, the chief operating officer undertook a comprehensive investigation, along with external counsel*.  Based on that investigation, the Company believes that the claim does not have merit.

> *CTPartners is fundamentally committed to a diverse workforce, and promotes an inclusive and positive working environment*.  CTPartners is proud that more than one-third of the firm's partners are women, and that 10 of the 17 end-of-year senior-level promotions were earned by female executives.

### Falsity of Statements Made in the December 8, 2014 Press Release

111.    The statements referenced above in ¶110 were materially false and misleading because they failed to disclose the following adverse information which was known to Defendants or recklessly disregarded by them:

- 41 -

(a)     that the Company had a long-standing practice of employment discrimination against women and had created a hostile work environment that exposed the Company to the heightened risk that its reputation and ability to attract and retain search consultants would be significantly damaged;

(b)     that the Company's statements that it "takes all allegations of discrimination very seriously" and was "fundamentally committed to a diverse workforce, and promotes an inclusive and positive working environment" omitted material facts concerning the Company's pattern and practice of ignoring employee complaints and fostering a hostile and discriminatory work environment; and

(c)     to the extent these statements were opinions or beliefs, they lacked a reasonable basis and omitted the facts stated in (a)-(b) above which were necessary to make these opinions or beliefs not misleading in the context in which they were made.

**Defendants' Contemporaneous Knowledge or Reckless Disregard for the Falsity of Statements Made in the December 8, 2014 Press Release**

112.    The following facts, viewed holistically together with all of the facts alleged herein, establish Defendants' scienter with respect to the false statements contained in ¶110:

(a)     Defendant Sullivan was the driving force behind the Company's culture of sexual harassment and lewd and inappropriate behavior;

(b)     senior management was directly engaged in discriminatory compensation practices against female employees;

(c)     the Company's human resources department received numerous reports of sexual discrimination;

(d)     on information and belief, after learning of the concerns of the employee who filed the EEOC Complaint, the Company filed a Form S-3 registration statement for the sale of

CTPartners common stock to the public, which was designed to allow Defendant Sullivan to dump up to 404,767 shares of his personally held CTPartners stock at artificially inflated prices;

(e)     on information and belief, after learning that *The New York Post* was planning to disclose details concerning the EEOC Complaint, the Company filed the Preliminary Prospectus, which was designed to allow Defendant Sullivan to dump up to 404,767 shares of his personally held CTPartners stock at artificially inflated prices; and

(f)     on information and belief, after the Company's COO personally undertook a comprehensive investigation of the concerns of the employee who filed the EEOC Complaint, instead of addressing the issues raised by this complaint, he sold 70% of his personal CTPartners stock.

113.     On January 14, 2015, *The New York Post* reported that an investor had asked the SEC to investigate whether the Company had withheld "vital information" related to the claims of sexual discrimination and improper conduct.  The investors' complaint reportedly stated: "The fact that the Corporation has failed to provide information about which it was aware as far back as 2012 shows a blatant disregard for the Corporation's current shareholders and the investing public in general . . . . That is information a current shareholder or potential future shareholder would want to know about in evaluating the Corporation stock and future prospects for investment purposes . . . .  The sexual discrimination and harassment claims are important information that investors and potential investors in the Corporation's stock should be made aware of in evaluating their decision whether to invest in and/or retain their investment in the Corporation . . . ."

X.     **4Q14 and Fiscal 2014 Earnings Release**

114.     On January 21, 2015, CTPartners announced its preliminary fourth quarter and full year 2014 financial results.  The Company announced preliminary adjusted EPS for the previous quarter of $0.06 to $0.08 per share, which came in well below the Company's original guidance of

adjusted EPS of $0.19 to $0.21 per share.  CTPartners blamed the miss on more than $1.3 million in purportedly unanticipated expenses related to increased management, administrative and business development costs.

115.     In the same earnings release, CTPartners also issued guidance for 1Q15 and full fiscal 2015, stating in pertinent part as follows:

> For the first quarter ending March 31, 2015, the Company is anticipating net revenue of $43 million to $45 million and adjusted EPS in the range of $0.08 to $0.12. For the full year ending December 31, 2015, the Company expects to report net revenue of approximately $200 million and adjusted EPS in the range of $0.90 to $1.00. Based on the Company's preliminary fourth quarter results and full year 2015 outlook revenue is expected to increase approximately 16% as the Company continues to expand its presence in key geographies and grow across each of its practice areas.

116.     On this news, the price of CTPartners stock dropped $3.63 per share to close at $8.87 per share on January 22, 2015, a one-day decline of more than 29%, on volume of over 900,000 shares.  However, CTPartners' stock price remained artificially inflated.

**Falsity of Statements Made in 4Q14 and Fiscal 2014 Earnings Release**

117.     The statements referenced above in ¶¶114-115 were materially false and misleading because the Company failed to fully disclose the financial impact of the revelations of discriminatory, lewd and improper conduct by its senior management and top employees.   In addition, these statements were false because, as Defendants knew or were reckless in not knowing, the Company had actually suffered an EPS *loss* for the quarter far below the $0.06 to $0.08 EPS gain Defendants had highlighted to investors because the Company had been forced to pay excess compensation to keep revenue-generating employees from fleeing en masse.  As explained below in ¶121, the Company announced the aforementioned EPS loss only one week after making the positive statements referenced above in ¶¶114-115.

**Defendants' Contemporaneous Knowledge or Reckless Disregard for the Falsity of Statements Made in 4Q14 and Fiscal 2014 Earnings Release**

118.     The following facts, viewed holistically together with all of the facts alleged herein, establish Defendants' scienter with respect to the false statements contained in ¶¶114-115:

(a)     Defendant Sullivan was the driving force behind the Company's culture of sexual harassment and lewd and inappropriate behavior;

(b)     senior management was directly engaged in discriminatory compensation practices against female employees;

(c)     the Company's human resources department received numerous reports of sexual discrimination;

(d)     on information and belief, after learning of the concerns of the employee who filed the EEOC Complaint, the Company filed a Form S-3 registration statement for the sale of CTPartners common stock to the public, which was designed to allow Defendant Sullivan to dump up to 404,767 shares of his personally held CTPartners stock at artificially inflated prices;

(e)     on information and belief, after the Company's COO personally undertook a comprehensive investigation of the concerns of the employee who filed the EEOC Complaint, he sold 70% of his personal CTPartners stock; and

(f)     based on the foregoing, Defendants lacked a reasonable basis for their 4Q14 EPS results and their 2015 guidance.

119.     On January 21, 2015, an analyst at William Blair downgraded the stock and dropped coverage of the Company, stating "we believe it is going to take a while for the company to regain credibility with investors . . . .  We also do not view the stock as consistent with our focus on quality growth stocks, so we are dropping coverage."

120.    On January 26, 2015, CTPartners again announced that it would conduct a stock offering pursuant to the August 20, 2014 shelf registration statement, this time for up to $12.5 million worth of the Company's stock.  Unlike the earlier preliminary prospectus, the prospectus issued in connection with the offering now stated that the proceeds would be used "for working capital and general corporate purposes," without mentioning acquisitions, which indicated a deterioration in the Company's cash position since the December 8th Article.

121.    Then, on January 28, 2015, just *one week* after CTPartners provided disappointing fourth quarter results, the Company revised downward those same results and withdrew its earnings guidance for 1Q15 and full fiscal year 2015.  The Company stated that it actually expected to post a fourth quarter adjusted EPS *loss* of $0.07 to $0.09 per share, down from the prior announced adjusted EPS gain of $0.06 to $0.08 per share.  The Company stated that the downward revision was due to a $1.7 million increase in "compensation expense" for employee bonuses.  In addition, CTPartners *once again* withdrew a proposed stock offering, pulling the January 26, 2015 offering.

122.    On this news, the price of CTPartners stock dropped $2.17 per share to close at $4.35 per share on January 29, 2015, a one-day decline of more than 33% on volume of over 2.1 million shares.  Another analyst, at Craig-Hallum Capital Group LLC, also suspended its coverage of the Company.

123.    On January 30, 2015, *The New York Post* reported on the stock slide in an article entitled "CTPartners Sinks One Day After Announcing Executive Raises":

> Wall Street downsized CTPartners on Thursday – one day after the executive search firm announced it was giving its executives a raise.
>
> The New York company saw its stock drop 33.3 percent on Thursday after announcing $1.7 million in fourth-quarter bonuses and a revised profit guidance for the period that increased its expected net loss by 170 percent.

- 46 -

CTPartners, headed by Chairman and CEO Brian Sullivan, also withdrew its forecast for the first quarter and 2015 – while pulling a $12.5 million stock offering it announced just 48 hours earlier.

*     *     *

CTPartners has said that the claims against it [in the EEOC Complaint] are without merit.

But for Sullivan, who has led the firm since 2004, alleged inappropriate behavior wasn't new, according to two former colleagues.

At a 2001 partners event in Barcelona, Spain, for example, while he was a vice chairman at a rival search firm, Heidrick & Struggles, Sullivan attempted to take off all his clothes on a bus en route to an afterparty, according to the two former employees.

Sullivan, who was a new father of twin girls at the time, yelled, "I'm going to show everyone my 'twin maker'!" the people said.

Even back on his wedding day, Sullivan's antics could have struck some as strange.

The CEO, in a photo seen by The Post, is handcuffed to his wife and is wearing an oversized lapel button that reads, "Life's a bitch and then you marry one."

124.    On February 5, 2015, *The New York Post*, in an article entitled "Troubled CTPartners Gets Takeover Bid From Rival Recruiter," reported that CTPartners stock had lost so much of its value from the shocking revelations that it had become a takeover target by a rival executive search firm, DHR International:

Troubled Wall Street executive search firm CTPartners has received a $7-a-share takeover bid from a Chicago rival, The Post has learned.

DHR International, a 25-year-old firm with offices around the globe, sent the CTPartners board a letter Feb. 4 outlining its $61 million cash offer.

CTPartners has run into cash flow problems in recent weeks, sources said – and on Jan. 30 announced a $5 million private placement of shares with an unidentified investor.

*     *     *

[David] Hoffman [the chairman of DHR] made the offer verbally at the suggestion of Sullivan, he said.

"Just submit your offer to me verbally," Sullivan told Hoffman. "I hand-picked the board and they will do what I say."

\*       \*       \*

The offer comes at a precipitous time for CTPartners.

Last week, it pulled a $12.5 million stock sale – its second aborted offering since December – and revised its fourth-quarter earnings guidance down because of an additional $1.7 million in fourth-quarter bonuses.

"*[The bonuses] fly in the face of the 75 percent loss for some shareholders*," Hoffman said, referring to the 71-point decline in CTPartners stock over the last three months.

"Usually you don't see those two things coincide," [he] said.

125.     As a result of Defendants' false statements, CTPartners common stock traded at artificially inflated prices during the Class Period.  However, after the above revelations seeped into the market, the Company's common stock was hammered by massive sales, causing economic loss and damages to Plaintiff and other members of the Class.  By June 10, 2015, CTPartners' stock price closed at $2.20 per share, down more than 90% from its Class Period high.

## RECENT DEVELOPMENTS

**CTPartners' Business Suffered Materially in the Wake of the EEOC Complaint**

126.     As alleged herein, CTPartners' pattern and practice of systemic discrimination against women, creation of a hostile work environment, and fostering of a lewd, abusive and inappropriate "boys' club" corporate culture that started at the highest echelon of management on down and which had persisted for years prior to the Class Period and continued throughout the Class Period, created substantial undisclosed risks for investors, including the risk that the Company would lose revenue-generating employees and clients if this perverse corporate culture ever became known to the

- 48 -

market.  At the end of the Class Period and up until the present, this risk has materialized, and has caused substantial damage to the Company, its business and its shareholders.

127.    In a January 29, 2015 report, an analyst with Craig-Hallum Capital Group LLC wrote: "**Reputation risk**: Executive search is a reputation driven industry, and both the negative press as well as guidance confusion may impact its reputation with customers."

128.    The allegations in the EEOC Complaint prompted Wellington Management, an institutional investor with about $900 billion in assets, to sever ties with CTPartners.  Moreover, in an earnings release issued on April 16, 2015, the Company acknowledged that "[t]he U.S. based business experienced softness because of reduced client demand as the Company's reputation was compromised due to adverse and misleading media reports as well as the departure of fifteen senior level consultants."

129.    On March 17, 2015, CTPartners announced that Defendant Sullivan would be terminated by the Company as CEO effective April 2, 2015.  He had been CEO since September 2004.

130.    On March 24, 2015, *HSZ Media* reported that CTPartners Vice Chairman Ron Porter was in talks to join rival firm Korn Ferry – following in the footsteps of several other high-level CTPartners executives to the exit, taking with them $17 million in annual consulting-related fees:

> ***If he joins Korn Ferry Mr. Porter will be the third vice chairman to depart CTPartners in recent weeks where a growing exodus of professionals is underway at the nation's seventh largest recruiting company***.  CTPartners has been the subject of an EEOC discrimination investigation and its chief executive, Brian Sullivan, resigned his post after more than a decade with the firm earlier this month.  Other recent departing executives heading to larger rivals: vice chairman Joe McCabe and financial services recruiter Jeremy Zeman left the firm to join Korn Ferry; vice chairman Ernie Brittingham left to pursue opportunities at Russell Reynolds Associates; and Daniel Kaplan left the firm to join Heidrick & Struggles as a co-managing partner of that firm's chief human resources officer (CHRO) practice.  ***Industry sources say these recent high level departing recruiters collectively produce more than $17 million in annual consulting-related fees***.

- 49 -

131.    According to his LinkedIn profile, Porter did in fact join Korn Ferry.

132.    CTPartners suffered tremendous losses to its partner ranks as part of the fallout of the disclosure of the way it treated female partners and employees.  In its Form 10-K filed with the SEC on April 16, 2015, the Company stated:

> The foregoing events have created significant challenges surrounding our business and, in particular, our ability to retain consultants and customers.  *Since December 31, 2014, 15 of our consultants have departed the firm, of which 2 were top ten revenue producers*.  These departures may have a material effect on our ability to generate revenue consistent with historical trends.

133.    On May 20, 2015, CTPartners announced that a special committee of its board of directors had agreed to enter into exclusive negotiations regarding the potential acquisition of the Company by DHR International.

134.    Meanwhile, the exodus of consultants has continued unabated, doubling over the course of only one month.  In its 1Q15 Form 10-Q, filed with the SEC on May 21, 2015 (the "May 21 Form 10-Q"), Defendants stated: "*Since December 31, 2014, approximately 30 of our consultants have departed the firm.*  These departures had a material effect on our ability to generate revenue consistent with our historical trends."[3]

---

[3]   The Company was unable to file its May 21 Form 10-Q on time in light of the financial turmoil caused by the revelation of the sexual discriminatory conduct and hostile work environment as alleged herein.  According to the Company's request for an extension of time, filed with the SEC on Form 12b-25 on May 15, 2015:

> The board and management continue to be largely occupied with the previously announced evaluation of strategic alternatives, as well as with discussions with the Company's lenders with respect to the Company's financial and operational condition, including the Company's current and ongoing ability to comply with the terms of its financing documents and with respect to the Company's strategic alternatives. In light of the foregoing, the Company could not complete the financial statements and related information required to be included in the Quarterly Report by the scheduled filing deadline.

135.     The mass departure of consultants has caused tremendous damage to the Company's ability to secure financing or even to continue to operate as a going concern.  In the May 21 Form 10-Q, the Company stated, in pertinent part, as follows:

> On April 8, 2015, the Company entered into an amendment of the credit line agreement and a $12.5 million aggregate principal amount second-lien note purchase agreement (the "Note Purchase Agreement") with a publicly traded insurance company and an affiliate thereof.  The notes are issuable in two tranches of $6.25 million. The first tranche closed on April 14, 2015, and the second tranche of $6.25 million is scheduled to close 90 days after the first funding, subject to certain conditions set forth in the Note Purchase Agreement.  The notes bear interest at an adjusted LIBOR rate (as defined in the Note Purchase Agreement) which is currently approximately 12%, and mature in 2020.
>
> **As of April 30, 2015, the Company violated the retention covenant, which required that revenue initiated by departed consultants did not exceed 10% of revenue for the past twelve months**.
>
> **The lenders granted a limited duration waiver of violation, under the terms of which the lenders forbear from enforcing their remedies in connection with this non-compliance until August 31, 2015 so long as certain milestones in connection with the proposed sale of the Company are met**.  Management believes the milestones in the transaction to sell the Company will be reached within specified period of time.  **In addition, the credit facility has been reduced from $20 million to $15.5 million and the interest rate increased by 25 basis points**, resulting in a current rate of approximately 3.18% per annum.  Also, the notes purchaser is not expected to purchase a second tranche of $6.25 million principal amount of notes, which had been scheduled to occur after June 30, 2015….
>
> The Company does not have sufficient cash flows from operations or cash resources to repay the credit facility or obligations under the Note Purchase agreement (See Note 11) if they become immediately due and payable at the lender's discretion after the limited duration waiver expires.  **This indicates substantial doubt about the Company's ability to continue as a going concern for a reasonable period of time.**

136.     In the May 21 Form 10-Q, the Company also acknowledged the massive fallout of the EEOC Complaint's allegations to the Company:

> Commencing in December 2014, we began receiving unfavorable publicity regarding a complaint submitted to the EEOC by a former employee.  We also withdrew an announced public equity offering in December 2014.  In January 2015, we announced preliminary fourth quarter results that fell short of our expectations and then subsequently revised those preliminary results downward.  We also withdrew our first quarter and full year 2015 earnings guidance at that time.  In light of that

> revision and withdrawal of guidance, we suspended marketing efforts for another
> announced public equity offering before completing a significantly downsized
> offering at the end of January 2015 for $4.2 million in net proceeds after
> underwriting discounts and expenses.  Our stock price declined significantly in
> December 2014 and January 2015, and several research analysts covering our
> Company ceased coverage.

Indeed, the May 21 Form 10-Q revealed that the Company's quarterly revenue had fallen to about

$35.7 million for the quarter, compared to approximately $41 million during the same period the

prior year, a decline of about 12.5%.

## ADDITIONAL SCIENTER ALLEGATIONS

137.    As alleged herein, CTPartners and the Individual Defendants acted with scienter in

that they knew and/or recklessly disregarded that the public documents and statements issued or

disseminated in the name of the Company were materially false and misleading; knew that such

statements or documents would be issued or disseminated to the investing public; and knowingly and

substantially participated or acquiesced in the issuance or dissemination of such statements or

documents as primary violations of the federal securities laws.  As set forth herein in detail, these

Defendants, by virtue of their receipt of information reflecting the true facts regarding CTPartners,

their control over, and/or receipt and/or modification of CTPartners' materially misleading

statements and/or their associations with the Company, participated in the fraudulent scheme alleged

herein.  Sullivan and other top Company executives were also principally involved in the sexual

discriminatory conduct and hostile work environment alleged herein, including by stripping naked at

Company events.

138.    Additionally, Defendant Sullivan was motivated to consciously and/or recklessly

make false and misleading statements and omissions in order to sell shares of his personally held

CTPartners common stock at inflated prices.  As explained above, Sullivan arranged an offering

of more than 700,000 shares of CTPartners common stock so that he could sell up to 404,767 shares

of his personally held CTPartners stock at artificially inflated prices.  On information and belief, this offering was arranged *after* Defendants learned of the concerns of the employee who filed the EEOC Complaint.

139.    These planned sales were unusual and suspicious in both amount and timing, as they were planned to occur near the time when the alleged material misstatements and omissions were made and after the EEOC Complaint had been filed.  These planned sales were also unusual for Sullivan because he had not sold any of his personally held CTPartners common stock since 2010. These planned sales were also unusual because they represented 33% of his personal holdings of CTPartners stock.

140.    Sullivan stood to *gain* $7.5 million if he sold 404,767 shares at the closing price of $18.50 per share on December 5, 2014.  Instead, he personally lost $6.2 million in paper losses when CTPartners stock plunged to $14.00 per share on December 8.

141.    Indeed, Sullivan was unable to unload his personal shares of CTPartners stock until June 2, 2015, when he sold 873,806 shares at an average price of $2.96 per share – or *84% less per share* than he would have been able to sell his shares in early December 2014 had the market not begun to learn of his fraudulent scheme and course of business.

142.    In addition to Sullivan's attempted sale of 33% of his holdings in the Company, David Nocifora, CTPartners' Chief Operating Officer, also engaged in suspicious insider selling.  In mid-to-late August 2014, Nocifora sold 70% of his holdings in the Company, as the following chart indicates:

| Date | Shares | Price | Proceeds | End of CP Holdings |
|------|--------|-------|----------|--------------------|
| 11-Aug-2014 | 79,817 | $14.13 | $1,127,814 | |
| 12-Aug-2014 | 18,724 | $14.07 | $263,447 | |
| 13-Aug-2014 | 1,459 | $14.14 | $20,630 | |
| 19-Aug-2014 | 5,280 | $15.90 | $83,952 | |
| 20-Aug-2014 | 3,494 | $15.95 | $55,729 | |
| 21-Aug-2014 | 26,800 | $16.08 | $430,944 | |
| 25-Aug-2014 | 54,426 | $17.12 | $931,773 | |
| | 190,000 | | $2,914,290 | 81,279 |

143.    In a press release dated December 8, 2014 responding to the December 8th Article, the Company said: "As soon as the firm was *informed of concerns by an employee earlier this year, the chief operating officer undertook a comprehensive investigation*, along with external counsel. Based on that investigation, the Company believes that the claim does not have merit."  In an interview with *Recruiter*, CTPartners' chief marketing officer said that, after the Company concluded that the claim was without merit, the employee concerned left the firm.  Following that, she filed the EEOC Complaint.

144.    Given the amount of time necessary to conduct a comprehensive investigation and the timing of the December 8th Article reporting on the EEOC Complaint, it is reasonable to infer that "the firm was informed of concerns by an employee" by no later than August of the same year, or at the very least had been informed of other internal complaints of sexual discrimination by that time.  Thus, on information and belief, after Nocifora had been informed of those concerns and personally investigated them, he unloaded 70% of the shares of CTPartners that he held.  Notably, Nocifora had not sold any of his personally held CTPartners common stock since 2010.

### MATERIALITY OF UNDISCLOSED FACTS

145.    CTPartners' undisclosed, company-wide pattern and practice of sex discrimination, which fostered a lewd and inappropriate work culture and created a hostile work environment, was

information that would have been viewed by a reasonable investor as having significantly altered the total mix of information made available.

146.    As explained above in ¶30, CTPartners employed only about 160 search consultants and 475 other full-time employees during the Class Period.  The rampant sex discrimination and hostile work environment among such a small cohort undermined the Company's ability to attract and retain search consultants.  Indeed, after the undisclosed facts were revealed, approximately 30 of the Company's search consultants left (including at least two top-ten revenue producers), revenues plummeted by 12.5%, and, as a result, the Company has been unable to meet certain covenants under its credit facility agreements thereby threatening its very existence.

147.    In addition, as explained above in ¶¶31-36, the executive search industry is driven by reputation and personal connections.  The undisclosed, company-wide pattern and practice of sex discrimination and hostile work environment impaired the Company's reputation among its customers.  In fact, the Company acknowledged that its "business experienced softness because of reduced client demand as the Company's reputation was compromised[.]"

## LOSS CAUSATION/ECONOMIC LOSS

148.    During the Class Period, as detailed herein, Defendants made false and misleading statements by misrepresenting the Company's business and operations and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of CTPartners common stock and operated as a fraud or deceit on Class Period purchasers of CTPartners common stock.  Later, as Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of CTPartners common stock fell precipitously, as the prior artificial inflation came out of the price over time, ultimately wiping out over 90% of the Company's share price.

149.    On December 8, 2014, as a result of the December 8th Article, the price of CTPartners stock dropped $4.50 per share to close at $14.00 per share on December 8, 2014, a decline of 24% from the prior closing price on volume traded of over 400,000 shares.

150.    On January 21, 2015, CTPartners announced preliminary adjusted EPS for the previous quarter of $0.06 to $0.08 per share, which came in well below the Company's original guidance of adjusted EPS of $0.19 to $0.21 per share.  CTPartners blamed the miss on over $1.3 million in purportedly unanticipated expenses related to increased management, administrative and business development costs.  On this news, the price of CTPartners stock dropped $3.63 per share to close at $8.87 per share on January 22, 2015, a one-day decline of more than 29%, on volume of over 900,000 shares.

151.    On January 28, 2015, one week after CTPartners provided disappointing fourth quarter results, the Company revised downward those same results and withdrew its earnings guidance for the first quarter and full fiscal year 2015.  The Company stated that it actually expected to post a fourth quarter adjusted EPS loss of $0.07 to $0.09 per share, down from the prior announced adjusted EPS gain of $0.06 to $0.08 per share.  The Company stated that the downward revision was due to a $1.7 million increase in "compensation expense" for employee bonuses.  In addition, CTPartners once again withdrew a proposed stock offering, pulling the offering announced on January 26, 2015.  On this news, the price of CTPartners stock dropped $2.17 per share to close at $4.35 per share on January 29, 2015, a one-day decline of more than 33% on volume of over 2.1 million shares.

152.    As a result of their purchases of CTPartners common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE
## AND FRAUD ON THE MARKET

153.   Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   The omissions and misrepresentations were material;

(c)   The Company's stock traded in an efficient market;

(d)   The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)   Plaintiff and other members of the Class purchased CTPartners common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

154.   At all relevant times, the market for CTPartners common stock was an efficient market for the following reasons, among others:

(a)   CTPartners stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)   As a regulated issuer, CTPartners filed periodic public reports with the SEC;

(c)   CTPartners regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(d)   CTPartners was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their

respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

155. As a result of the foregoing, the market for CTPartners common stock promptly digested current information regarding CTPartners from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of CTPartners common stock during the Class Period suffered similar injury through their purchase of CTPartners common stock at artificially inflated prices and a presumption of reliance applies.

156. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding CTPartners' business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

157. Defendants' false and misleading statements during the Class Period were not forward-looking statements ("FLS") and/or identified as such by Defendants, and thus did not fall within any "Safe Harbor."

158. To the extent any false and misleading statements are determined to be FLS, CTPartners's verbal "Safe Harbor" warnings accompanying its oral FLS issued during the Class Period were ineffective to shield those statements from liability.

159.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of CTPartners who knew that the FLS was false.

160.    None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## CLASS ACTION ALLEGATIONS

161.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased CTPartners common stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

162.    The members of the Class are so numerous that joinder of all members is impracticable.  The stock is actively traded on the NYSE and there are more than 7.2 million shares of CTPartners stock outstanding.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by CTPartners or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

163.     Common questions of law and fact predominate and include: (i) whether Defendants violated the Exchange Act; (ii) whether Defendants omitted and/or misrepresented material facts; (iii) whether Defendants knew or recklessly disregarded that their statements were false; and (iv) whether Defendants' statements and/or omissions artificially inflated the price of CTPartners common stock and the extent and appropriate measure of damages.

164.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

165.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

166.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

167.     Plaintiff incorporates all allegations in ¶¶1-166 above by reference.

168.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

169.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)      Employed devices, schemes, and artifices to defraud;

(b)      Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)      Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of CTPartners common stock during the Class Period.

170.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CTPartners common stock.  Plaintiff and the Class would not have purchased CTPartners common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

171.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of CTPartners common stock during the Class Period.

### COUNT II

**For Violation of §20(a) of the Exchange Act**
**Against the Individual Defendants**

172.    Plaintiff incorporates all allegations in ¶¶1-171 above by reference.

173.    The Individual Defendants acted as controlling persons of CTPartners within the meaning of §20(a) of the Exchange Act.  By virtue of their positions with the Company, and ownership of CTPartners stock, the Individual Defendants had the power and authority to cause CTPartners to engage in the wrongful conduct complained of herein.  The Individual Defendants

controlled CTPartners.  By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiff as Class Representative and Lead Counsel as Class Counsel;

B.      Awarding Plaintiff and other members of the Class damages and interest;

C.      Awarding Plaintiff's reasonable costs, including attorneys' fees; and

D.      Awarding Plaintiff and other members of the Class such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  June 15, 2015                     ROBBINS GELLER RUDMAN
                                             & DOWD LLP
                                          SAMUEL H. RUDMAN
                                          DAVID A. ROSENFELD
                                          ALAN I. ELLMAN


                                          _____/s/ Samuel H. Rudman_____
                                          SAMUEL H. RUDMAN

                                          58 South Service Road, Suite 200
                                          Melville, NY  11747
                                          Telephone:  631/367-7100
                                          631/367-1173 (fax)
                                          srudman@rgrdlaw.com
                                          drosenfeld@rgrdlaw.com
                                          aellman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
bcochran@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

LAW OFFICES OF MARC S. HENZEL
MARC S. HENZEL
431 Montgomery Avenue, Suite B
Merion Station, PA  19066
Telephone:  610/660-8000
610/660-8080 (fax)

*Additional Counsel for Lead Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I, Samuel H. Rudman, hereby certify that on June 15, 2015, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.


*/s/ Samuel H. Rudman*
Samuel H. Rudman