UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

STEPHEN P. LOPEZ, *individually and on behalf of others*
*similarly situated*,

                                        Plaintiff,

                    -v-

CTPARTNERS EXECUTIVE SEARCH INC., BRIAN M.
SULLIVAN, and WILLIAM J. KENEALLY,

                                        Defendants.

------------------------------------------------------------------------X

15 Civ. 1476 (PAE)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/29/16

PAUL A. ENGELMAYER, District Judge:

In this putative class action under the securities laws, plaintiff claims that the executive

search company, CTPartners Executive Search Inc. ("CTPartners" or the "Company"), and two

of its top executives, Brian M. Sullivan and William J. Keneally (collectively, "defendants"),

made false and misleading statements touting the Company's culture for honesty and integrity.

Specifically, the Amended Complaint faults defendants for not disclosing that the Company

posed a hostile environment for and discriminated against female employees, as exemplified by

lewd escapades by top male executives in the presence of female employees which the *New York

Post* revealed in a December 8, 2014 article ("*NY Post* article").  The Amended Complaint

further alleges that the Company's ensuing preliminary statement of its earnings for the fourth

quarter of 2014 was false and misleading, because it did not take into account the known need

for the Company to pay bonuses to employees to incent them not to abandon the Company in the

wake of the *NY Post* article.

The plaintiff, Stephen P. Lopez,[1] a CTPartners shareholder, alleges violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and the corresponding rule of the United States Securities and Exchange Commission, 17 C.F.R. § 240.10b–5 ("Rule 10b–5").  Pending now is defendants' motion to dismiss the Amended Complaint for failure to state a claim, under Federal Rules of Civil Procedure 12(b)(6) and 9(b).  For the following reasons, the Court grants the motion to dismiss.

## I.     Background[2]

### A.     Factual Background

CTPartners is a New York-based company that facilitates recruitment and hiring of senior executives and board members.  AC ¶¶ 2, 21.  Between February 26, 2014 and January 28, 2015 (the "Class Period"), the Company employed approximately 160 search consultants and 475 other full-time employees.  *Id.* ¶¶ 1, 146.  Sullivan was CTPartners' chairman and chief executive officer ("CEO") between September 2004 and April 2, 2015, *id.* ¶ 23, and Keneally has been its chief financial officer ("CFO") since April 2013, *id.* ¶ 24.  Plaintiff Lopez bought CTPartners common stock during the Class Period, *id.* ¶ 20, and has been appointed by this Court as lead plaintiff, Dkt. 32.

The Amended Complaint centers on the "precipitous decline" of CTPartners common stock price in the aftermath of a December 8, 2014 *NY Post* article recounting allegations of lewd

---

[1] The Amended Complaint identifies plaintiff as Stephen P. Lopez, though the submissions seeking to have him appointed as lead plaintiff referred to him as "Steve."  Dkts. 19–21.

[2] These facts are drawn primarily from the Amended Complaint.  Dkt. 36 ("AC").  For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiffs.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  The Court also considers documents incorporated into the Amended Complaint by reference and documents publicly filed with the Securities Exchange Commission ("SEC").  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

behavior and gender discrimination by top executives at the Company. AC ¶ 14. The article, entitled "Wall Street Recruiters Had Boozy Naked Romps: Complaint," was based primarily on a confidential complaint filed by a former employee with the Equal Employment Opportunity Commission (the "EEOC Complaint"). *Id.* ¶ 4 (quoting *NY Post* article) (internal quotation marks omitted).[3] The article principally revealed a "drunken party" at Sullivan's home in May 2012 in which, in the presence of various partners, "Sullivan and at least three other top executives shed their clothes, formed a rugby-like scrum and ran into the ocean." *Id.* ¶¶ 4 (quoting the *NY Post* article), 63 (same).[4]

The *NY Post* article further disclosed that the EEOC Complaint had alleged other lewd acts by executives and depicted the Company as a "boys' club." *Id.* ¶ 5 (quoting *NY Post* article) (internal quotation marks omitted). For example, an employee in CTPartners' hedge fund practice allegedly called himself "daddy" and told a female employee he wanted to spank her; and vice chairman Burke St. John allegedly called women into his office and remarked how the shadows of New York City buildings looked like penises. *Id.*

The *NY Post* article reported that the EEOC Complaint also alleged gender discrimination in the compensation and treatment of female employees. According to the article, the EEOC Complaint alleged that "[w]omen routinely were stripped of profitable accounts, which were handed to male colleagues. They also were held to a higher standard for performance and were

---

[3] Although the article's title as recited in the Amended Complaint is the same as it appears on the NY Post website, http://nypost.com/2014/12/08/complaint-claims-executives-held-boozy-naked-boys-club-romps (last visited March 28, 2016), as presented on Westlaw the article is titled: "SEARCH & DISROBE Top recruiter named in 'boys club' complaint." 2014 WLNR 34658073.

[4] The article's author stated that he had corroborated the account of the nude plunge with "former workers who claim to be witnesses." *Id.* ¶¶ 4 (quoting the *NY Post* article), 39.

let go even if they brought in more money than male counterparts . . . .  The firm's New York office had more than a dozen different sexual-harassment complaints brought internally in 2012."  *Id.* ¶ 6 (quoting *NY Post* article) (emphasis omitted).[5]

Plaintiff alleges that these revelations exposed as false and misleading various statements CTPartners had long made touting its culture for honesty and integrity.  These (detailed below) were to the effect that the Company's culture was "strong" and "performance based," and that search consultants "stay and new ones want to come here because of the CTPartners culture," AC ¶¶ 73, 82 (emphasis omitted); that the Company had a Code of Conduct that identified its "reputation for honesty and integrity [as] among [its] most important assets," *id.* ¶¶ 2, 78; that the Company's compensation structure was "completely transparent," *id.* ¶ 69 (emphasis omitted); and that the Company had a very low voluntary turnover rate, as a result of its culture and compensation scheme, *id.* ¶¶ 69, 73, 82, 90.

On December 8, 2014, CTPartners issued a press release responding to the *NY Post* article.  It acknowledged that an EEOC Complaint had been filed by a former employee who had voiced concern about gender discrimination at the Company "earlier this year."  *Id.* ¶¶ 11, 110 (emphasis and internal quotation marks omitted).  It stated that its chief operating officer

---

[5] The Amended Complaint represents that plaintiff's counsel has corroborated the allegations and events described in the *NY Post* Article, as well as similar other incidents, through interviews with five unidentified former employees ("FE" 1 through 5) of CTPartners.  AC ¶¶ 7, 41–66. The employees worked at CTPartners for varying periods ending between 2012 and 2014, and included three partners, a research associate, and an executive assistant.  *Id.*  The Court recounts in more detail below the statements attributed to these persons.  In summary, these statements confirm seeing Sullivan's 2012 *au naturel* frolic at the Company's global partner meeting at his house, *id.* ¶ 64; allege that women were deprived of their fair share of bonus "splits" for work they performed on executive searches, *id.* ¶¶ 46–48, 50, 52–53; and allege that a number of women (approximately five to six from the New York office between 2011 and 2014, and 13 from the Company overall from 2011 to 2012) were let go from the Company despite allegedly outperforming male counterparts, *id.* ¶¶ 54, 56–57.

("COO"), David Nocifora, "undertook a comprehensive investigation, along with external counsel," and, based on that investigation, the Company stated that it "believes the claim does not have merit." *Id.* ¶ 110 (emphasis omitted). The press release added that "CTPartners takes all allegations of discrimination very seriously . . . [and] is fundamentally committed to a diverse workforce, and promotes an inclusive and positive working environment." *Id.* (emphasis omitted). The Amended Complaint alleges that these statements, too, were false and misleading. *Id.* ¶ 111.

On January 21, 2015, CTPartners issued a press release announcing preliminary earnings results for the fourth quarter and full year 2014. *Id.* ¶ 114. It stated that preliminary adjusted earnings per share (EPS) for the fourth quarter would be $0.06 to $0.08 per share. *Id.* The press release explained that these projected earnings were below the Company's previous guidance of $0.19 to $0.21 per share, as a result of $1.3 million in unanticipated expenses related to increased management, administrative, and business development costs. *Id.* The press release also issued revenue guidance for the first quarter and full year 2015, anticipating adjusted EPS of $0.08 to $0.12 for the first quarter and $0.90 to $1.00 for the full year. *Id.* ¶ 115. The Amended Complaint alleges that these statements, too, were false and misleadingly positive. *Id.* ¶ 117.

On January 28, 2015, one week later, CTPartners withdrew its revenue guidance for the first quarter and full year 2015, and revised its preliminary earnings guidance for the fourth quarter and full year 2014. The Company now stated that it expected adjusted fourth quarter EPS to be a loss of $0.07 to $0.09, rather than the gain of $0.06 to $0.08 per share previously stated. *Id.* ¶ 121. The Company explained that the revision of the 4Q14 earnings was due to a $1.7 million increase in compensation expense for employee bonuses. *Id.*

Thereafter, the Company continued its decline.  On March 17, 2015, CTPartners announced that Sullivan would be terminated as CEO effective April 2, 2015.  *Id.* ¶ 129.  The Company also began to experience an exodus of its search consultants.  In its Form 10-Q filed on May 21, 2015, the Company stated that "[s]ince December 31, 2014, approximately 30 of our consultants have departed the firm."  *Id.* ¶ 134 (quoting the Form 10-Q) (emphasis and internal quotation mark omitted).

The Amended Complaint alleges that four actions by insiders and the Company itself in the period before the *NY Post* article reveal that Company leadership knew the Company's public statements had been misleadingly positive.  First, in August 2014, COO Nocifora, who later was identified as the person who conducted the internal investigation into the employee "concerns" regarding lewd and discriminatory behavior, sold 70% (190,000 shares) of his CTPartners stock.  *Id.* ¶¶ 11, 142.  Before the sales, Nocifora had not sold any CTPartners stock since 2010.  *Id.* ¶ 144.  The Amended Complaint alleges, on information and belief, that by August 2014, Nocifora "had been informed of [employee] concerns [of sex discrimination] and personally investigated them" prior to his sale of company stock.  *Id.*  Second, on August 5, 2014, CTPartners filed a Form S-3 registration statement with the SEC, which, effective August 20, 2014, allowed the Company to sell up to $50 million in its common stock on an ongoing basis, and Sullivan to offer 404,767 shares of his personal shares (about one-third of the 1,214,300 shares he owned in the Company).  *Id.* ¶¶ 14, 94, 142; *see* Gabriel Decl., Ex. A (Preliminary Prospectus Supplement filed on December 8, 2014), at 29.  Third, on December 8, 2014, the same day as the publication of the *NY Post* article, CTPartners announced before the stock market opened that the Company would be offering for sale 702,703 shares of common stock, and that Sullivan would be offering 404,767 shares, pursuant to the Company's shelf registration statement.  *Id.* ¶¶ 9, 101.  Later that

6

day, the announced stock offering was withdrawn.  *Id.* ¶ 9.  The Amended Complaint alleges that CTPartners became aware of the impending publication of the *NY Post* article by at least December 5, 2014, the Friday before the Monday publication.  *Id.* ¶¶ 9, 108.  And fourth, on January 26, 2015 (after it announced its preliminary earnings results for 4Q14 and full year 2014), the Company again announced a stock offering, for $12.5 million of stock, pursuant to the August 20, 2014 registration statement.  *Id.* ¶ 120.  According to the Amended Complaint, unlike the December 8 preliminary prospectus, this one indicated that "the proceeds would be used 'for working capital and general corporate purposes,' without mentioning acquisitions, which indicated a deterioration in the Company's cash position since the December 8th Article."  *Id.* On January 28, 2015, however, the same day that the Company issued revised preliminary earnings and withdrew its earnings guidance for the upcoming quarter and fiscal year, the Company withdrew its proposed offering.  *Id.* ¶ 151.

In the aftermath of the December 8, 2014 *NY Post* article, CTPartners common stock price "plummeted."  *Id.* ¶ 10.  The stock had reached $23.15 per share on November 12, 2014, *id.* ¶ 3, but it dropped on December 8, 2014, the date the *NY Post* article was published, and the date the Company announced its intention to offer 702,703 shares of common stock, from the previous day's closing price of $18.50 to close at $14.00, a one-day drop of 24%.  *Id.* ¶¶ 4, 9–10. The next day, after the Company's withdrawal of the plan to offer additional common stock, the common stock price partially rebounded, closing at $15.23.  Nasdaq CTPartners Executive Search Inc. Historical Stock Prices, *available at* http://www.nasdaq.com/symbol/ctpr/historical [Hereinafter Historical Prices CTPR].  On January 22, 2015, the day after the Company announced preliminary adjusted earnings for 2014 and guidance for 2015, the stock price dropped $3.63 per share to close at $8.87 per share from a previous close of $12.50, a 29% one-

day decrease.  AC ¶ 116; Historical Prices CTPR.  On January 29, 2015, the day after

CTPartners revised its 2014 preliminary guidance and withdrew its 2015 guidance, the

Company's stock price dropped $2.17 per share to close at $4.35 per share from a previous close

of $6.52, a one-day decline of 33%.  AC ¶ 122; Historical Prices CTPR.  On June 2, 2015,

Sullivan sold 873,806 shares in the Company at an average price of $2.96 per share.  AC ¶ 141.

### B.     Procedural History

On February 27, 2015, Richard Zinno filed the original complaint in this case.  Dkt. 1.

On May 18, 2015, the Court approved an unopposed motion to appoint Lopez as lead plaintiff

and his attorneys as lead counsel.  Dkt. 32.

On June 15, 2015, plaintiff filed the Amended Complaint.  Dkt. 36.  On July 13, 2015,

defendants CTPartners and Keneally jointly, and Sullivan separately, moved to dismiss, Dkts.

38, 40, along with supporting memoranda of law, Dkts. 42 ("Def. Br."), 39 ("Sullivan Br.").[6]

Defendants also filed a declaration of Jessie M. Gabriel in support of their motion to dismiss,

which attached, *inter alia*, full copies of relevant CTPartners SEC filings.  Dkt. 41 ("Gabriel

Decl.").  On August 10, 2015, plaintiff filed a memorandum of law in opposition to defendants'

motion to dismiss.  Dkt. 49 ("Pl. Br.").  On August 24, 2015, defendants CTPartners and

Keneally, jointly, and Sullivan separately, filed reply memoranda of law in support of dismissal.

Dkts. 51 ("Def. Reply Br."), 52 ("Sullivan Reply Br.").

On October 21, 2015, the Court heard argument. ("Tr.").  On October 26, 2015, plaintiff

filed a letter responding to a question posed by the Court at argument.  Dkt. 53.  On November 2,

2015, with leave of Court, defendants filed a letter in response.  Dkt. 57.

---

[6] Sullivan joined the memorandum of law submitted by CTPartners and Keneally, but wrote
separately to add additional arguments in support of dismissal as to him.  Sullivan Br. 1.  For
ease of reference, the Court will refer to these two motions as the "motion to dismiss."

## II.       Applicable Legal Principles

### A.       Standard for Resolving the Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  Although the court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–24 (2007).

First, a complaint alleging securities fraud must meet the requirements of Federal Rule of Civil Procedure 9(b).  *See ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).  Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI*, 493 F.3d at 99.

Second, such a complaint must comply with the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b).  *See JP Morgan*, 553 F.3d

at 196.  In particular, where a plaintiff's claims depend upon allegations that the defendant has made an untrue statement of material fact or that the defendant omitted a material fact necessary to make a statement not misleading, the plaintiff "shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u–4(b)(1).  Thus, to plead a claim of securities fraud, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so."  *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).  In addition, the plaintiff "shall, with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2).  "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged.'" *ATSI*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324) (alterations and emphasis in original).

### B.    Elements of Plaintiff's Claims

Plaintiff asserts claims under §§ 10(b) and 20(a) of the Exchange Act, and Rule 10b–5. AC ¶¶ 167–73.

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  The SEC's implementing rule, Rule 10b–5, provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R, § 240.10b–5.

To state a claim under § 10(b) of the Exchange Act, a plaintiff must adequately plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection

between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (internal quotation marks and citation omitted).

To state a claim under § 20(a) of the Exchange Act, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI*, 493 F.3d at 108) (internal quotation marks omitted).  If a plaintiff has not adequately alleged a primary violation, *i.e.*, a viable claim under another provision of the Exchange Act, then the § 20(a) claims must be dismissed.

## 1.    False or Misleading Statement or Omission

To survive a motion to dismiss, the Amended Complaint must adequately plead "that the defendant made a statement that was 'misleading as to a material fact.'" *Matrixx Initiatives*, 563 U.S. at 38 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)) (emphasis omitted). Significantly, Section 10(b) and Rule 10b–5 "do not create an affirmative duty to disclose any and all material information." *Id*. at 44; *see also Basic*, 485 U.S. at 239 n.17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5.").  "Disclosure of . . . information is not required . . . simply because it may be relevant or of interest to a reasonable investor." *Resnick v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002).  An omission of information not affirmatively required to be disclosed is, instead, actionable only when disclosure of such information is "necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b–5(b)) (ellipses in original).

As for the materiality requirement, it "is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Id.* at 38 (quoting *Basic*, 485 U.S. at 231–32) (internal quotation marks omitted). As the Supreme Court has explained, a lower standard of materiality—for example, one defining a "material fact" as any "fact which a reasonable shareholder *might* consider important"—would lead corporations to "bury the shareholders in an avalanche of trivial information[,] a result that is hardly conducive to informed decisionmaking." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49 (1976). The "materiality hurdle" is, therefore, "a meaningful pleading obstacle." *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013). However, because the materiality inquiry is fact-intensive, a Court may not dismiss a complaint "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Carpenters Pension Trust Fund*, 750 F.3d at 235 (quoting *JP Morgan*, 553 F.3d at 197).

## 2.    Application to Statements of Opinion

Like objective statements of material fact, subjective statements of opinion can be actionable as fraud. As the Supreme Court has recently clarified, and the Second Circuit has recognized, such statements of opinion can give rise to liability in two distinct ways. First, "liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting fact she supplied were untrue.'" *See Tongue v. Sanofi*, No. 15-588-CV, --- F.3d ----, 2016 WL 851797, at *7 (2d Cir. Mar. 4, 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015)). "It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events." *In re Salomon Analyst Level 3*

12

*Litig.*, 350 F. Supp. 2d 477, 489 (S.D.N.Y. 2004).  "The Second Circuit has firmly rejected this 'fraud by hindsight' approach."  *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004) (citing *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 85 (2d Cir. 1999)).

Second, "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor."  *Id.* (citing *Omnicare*, 135 S. Ct. at 1332).  To sufficiently allege that a statement of opinion was misleading through the omission of material information, "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  *Id.* (quoting *Omnicare*, 135 S. Ct. at 1332).  As the Supreme Court has explained, "a reasonable investor, upon hearing a statement of opinion from an issuer, 'expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at a time.'"  *Id.* (quoting *Omnicare*, 135 S. Ct. at 1329).  "The core inquiry," then, "is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'"  *Id.* (quoting *Omnicare*, 135 S. Ct. at 1329).

The Supreme Court has instructed that its ruling that material omissions of facts may render a statement of opinion actionable should not be given "an overly expansive reading," and establishing liability on such a theory "is no small task for an investor" to meet.  *Id.* at *7–8 (quoting *Omnicare*, 135 S. Ct. at 1332) (internal quotation marks omitted).  "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts, and . . . [do] not expect that *every* fact known to an issuer supports its opinion statement."  *Id.* at *8 (quoting

*Omnicare*, 135 S. Ct. at 1329) (alterations and internal quotation marks omitted).  "[A] statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way."  *Id.* (quoting *Omnicare*, 135 S. Ct. at 1329).

Further, statements of opinion must be considered in the context in which they arise. Particularly in the context of formal documents filed with the SEC, "'[i]nvestors do not, and are right not to, expect opinions contained in those statements to reflect baseless, off-the-cuff judgments'; '[a]t the same time, an investor reads each statement within such a document . . . in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information.'"  *Id.* (quoting *Omnicare*, 135 S. Ct. at 1330) (alterations in original).  Moreover, "'the investor takes into account the customs and practices of the relevant industry,' and . . . 'an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame.'"  *Id.* (quoting *Omnicare*, 135 S. Ct. at 1330).

### 3.    The PSLRA Safe Harbor for Forward-Looking Statements

The PSLRA amended the Exchange Act to provide a safe harbor for forward-looking statements.  *See* 15 U.S.C. § 78u-5(c).  Forward-looking statements are defined as those that contain, among other things, "a projection of revenues, income, [or] earnings," "plans and objectives of management for future operations," or "a statement of future economic performance."  *Id.* § 78u–5(i)(1).  A forward-looking statement is not actionable if it "is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading."  *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010).  Because the statute is written in the disjunctive, statements are protected by the safe harbor if they satisfy any one of these three categories.  *Id.* Materiality is defined above; the other two categories are defined as follows:

14

*Meaningful cautionary language:*   To qualify as "meaningful," cautionary language "must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements." *Id.* at 771 (quoting H.R. Conf. Rep. 104-369, at 43 (1995)).   Language that is "vague" or "mere boilerplate" does not suffice. *Id.* at 772.   "To determine whether cautionary language is meaningful, courts must first 'identify the allegedly undisclosed risk' and then 'read the allegedly fraudulent materials— including the cautionary language—to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist.'"   *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014) (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)).   Plaintiffs may establish that cautionary language is not meaningful "by showing, for example, that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss." *Halperin*, 295 F.3d at 359.

*Actual knowledge:*   The scienter requirement for forward-looking statements—actual knowledge—is "stricter than for statements of current fact.   Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity."   *Slayton*, 604 F.3d at 773 (quoting *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir. 2009)) (internal quotation mark omitted).   And under the heightened pleading standards, which apply to both scienter requirements, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."   15 U.S.C. § 78u–4(b)(2).   "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could

draw from the facts alleged.'"  *ATSI*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324)

(alterations and emphasis in original).

### III.    Analysis

There are, broadly, two categories of statements that plaintiff claims are false or

misleading.  *See* AC ¶¶ 69–125.  The first concerns the Company's culture and reputation.  *Id.* ¶¶

69–113.  The second concerns the Company's preliminary financial results for the fourth quarter

and full year 2014.  *Id.* ¶¶ 114–25.

For the reasons that follow, the Court holds that the statements regarding the Company's

culture and reputation are not actionable because they are immaterial puffery, with the sole

exception of the Company's statements regarding its voluntary turnover rate, which the Court

holds was not false or misleading.  As for the statements regarding preliminary financial results,

the Court holds that these are not actionable because plaintiff has not adequately pled that they

were false at the time they were made.

### A.    Statements Regarding Company Culture

The Amended Complaint identifies nine contexts in which CTPartners or Sullivan made

public statements that positively depicted the Company's culture, including in the Company's

SEC filings and press releases, and on earnings calls or at public events, between February 26,

2014 and December 8, 2014.  *Id.* ¶¶ 69–113.  Plaintiff argues that the statements to this effect

describe a central asset of CTPartners' business, because the "executive search industry depends

on personal connections, insider knowledge, and industry access [and it] is axiomatic that

'executive search is a reputation driven industry.'"  *Id.* ¶ 31 (quoting a financial analyst who

covers CTPartners).

These statements are helpfully sorted as follows.  Some describe the Company's culture

generally—for example, statements to the effect that CTPartners has a "one-firm culture" that is

"strong," and characterized by "performance quality and results orientation," which in turn is "the primary reason we attract and . . . the primary reason we keep our consultants." *Id.* ¶¶ 72–73, 82, 102 (emphasis omitted). Specifically, in its 2013 10-K, the Company stated: "We consider relations with our employees to be good." *Id.* ¶ 72. In a June 23, 2014 press release touting its new brand identity, the Company pledged a "renewed commitment to accountability and transparency in the marketplace," and stated that "our one global P/L philosophy creates best team collaboration." *Id.* ¶ 86 (emphasis omitted). And as noted, in response to the *NY Post* article, the Company issued a press release stating, generally, that it "takes all allegations of discrimination very seriously" and "is fundamentally committed to a diverse workforce, and promotes an inclusive and positive working environment." *Id.* ¶ 110 (emphasis omitted).

Another statement incorporated by reference the Company's Code of Business Conduct and Ethics (the "Code"). Specifically, in a proxy statement for a shareholder meeting to be held on June 18, 2014, the Company stated that the Code "applies to all of its employees, including its Chief Executive Officer and its Chief Financial Officer." *Id.* ¶ 77 (emphasis omitted). The Code identified "CTPartners' reputation for honesty and integrity [as] among [its] most important assets" and stated that it was "adopted . . . to deter wrongdoing and to promote . . . honest and ethical conduct, . . . [and c]ompliance with all applicable laws." *Id.* ¶ 78 (emphasis omitted). And under the Code, CTPartners "expects all employees and directors to act with the highest standards of honesty and ethical conduct," and noted that the Company's goodwill with clients "is one of [its] most important assets, and Company employees must act to preserve and enhance the Company's reputation." *Id.* (emphasis omitted).

Other statements concerned the Company's compensation structure. At a public business conference, Sullivan stated that the "compensation structure that we have is completely

transparent.  It's a grid, it is unique to the industry.  Everybody understands how they get paid, what they get paid and everybody appreciates that it is transparent and it is objective versus subjective."  *Id.* ¶ 69 (emphasis omitted).  In its 2013 10-K, the Company also described its compensation and promotion processes:

> We believe the high caliber, extensive experience and motivation of our professionals are critical factors to our success. We utilize a combination of base salary, revenue and volume bonuses, discretionary bonuses and equity compensation to compensate our employees. . . .  Promotion to executive search consultant is based on a variety of factors, including demonstrated superior execution and business development skills, the ability to identify solutions to complex issues, personal and professional ethics, a thorough understanding of the market and the ability to develop and build effective teams.

*Id.* ¶ 72 (emphasis omitted).  In the preliminary prospectus filed on December 8, 2014, the Company again commented on its compensation structure, stating that its "incentive compensation structure is designed to focus our executive search consultants . . . on successfully making the placements . . . within our stated goal of 100 days from our engagement," and that its "compensation structure and one-firm culture motivates our executive search consultants to source the team they believe is best-suited for each situation and drives them to deliver results for the client."  *Id.* ¶ 102.

Finally, the Company made statements referencing its voluntary turnover rate:  At a public business conference, Sullivan stated that the compensation structure "is a significant contributor to our voluntary turnover rate being the lowest in the industry and that's just great."  *Id.* ¶ 69.  And in its 1Q14 and 2Q14 10-Q, the Company stated that "[w]e continue to attract and retain high quality, experienced consultants. . . .  We are particularly proud of our low voluntary turnover rate in the first quarter, which, at three people, continues to be the lowest in the industry that we can see," and that "[s]peaking of why they stay, our voluntary turnover record was less than 1% in the quarter—one person."  *id.* ¶¶ 82, 90; *see also id.* ¶ 73 (Sullivan made similar

comments during the investor conference call following the release of their 2013 10-K); *id.* ¶ 96 (Sullivan stated during investor call after release of the 3Q13 10-Q that the Company "lead[s] the industry in maintaining a solid, steady base of consultants who fit very nicely in our culture which is the executive search business" (emphasis omitted)).

### 1.    Immaterial Puffery

Defendants argue that the statements recounted above—save for the purely factual statements regarding the voluntary turnover ratio—are inactionable as immaterial puffery. They argue that the statements were "of general corporate optimism and puffing on which no reasonable investor would rely to make investment decisions." Def. Reply Br. 2; *see id.* at 1–3; Def. Br. 6–8.

"The materiality of a misstatement depends on whether 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act].'" *JP Morgan*, 553 F.3d at 197 (quoting *Basic*, 485 U.S. at 231–32) (alteration in original) (internal quotation marks omitted). "In other words, in order for the misstatement to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Id.* (quoting *Basic*, 485 U.S. at 231–32) (internal quotation marks omitted).

The Second Circuit has cautioned that "[b]ecause materiality is a mixed question of law and fact, in the context of a Fed. R. Civ. P. 12(b)(6) motion, 'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Id.* (quoting *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000)) (ellipses in original) (internal quotation marks omitted). However, statements that are too vague or general or are merely reflections of corporate puffery are not

19

actionable.  "To be 'material' within the meaning of § 10(b), the alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome which, when it proves false or does not occur, forms the basis for a § 10(b) fraud claim." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014).  "It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'" *Id.* at 183 (quoting *JP Morgan*, 553 F.3d at 206).

Here, the Court agrees with defendants that—with the exception of the statement about voluntary turnover rate, which is a statement of fact—the statements on which plaintiff seizes were inherently immaterial puffery.  Broad statements about a "strong" culture that is "results orient[ed]," and that the Company is committed to "transparency" in the marketplace, "consist of precisely the type of 'puffery' that [the Second] and other circuits have consistently held to be inactionable." *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (per curiam) (statements regarding "financial integrity" inactionable); *see also In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 475 (S.D.N.Y. 2006) (statements regarding "culture of excellence" was puffery).  CTPartners' statements regarding its "transparent" and "objective" compensation structure are, similarly, so broad and nebulous as to not provide any specific or concrete guarantee on which a reasonable investor could have relied.  Similarly, CTPartners' responses to the *NY Post* article—to the effect that it was taking discrimination allegations "very seriously" and noting its "promot[ion of] an inclusive and positive working environment"—are too hazy and general for any reasonable investor to have relied upon them.

The statements in the Code are also not actionable, because they are quintessentially the sort of puffery about corporate "reputation, integrity, and compliance with ethical norms" that define the category.  *UBS*, 752 F.3d at 183; *cf. Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 36–37 (2d Cir. 2012) (summary order) (statement that "recently posted code of practices and procedures 'underscores [company's] dedication towards transparent and independent decision-making process'" held not actionable).  Moreover, like the statements in *UBS*, the statements in the Code itself are "explicitly aspirational."  *UBS*, 752 F.3d at 183; *see* AC ¶ 78 (the Code was adopted "to deter wrongdoing" and "promote . . . honest and ethical conduct").

In holding CTPartners' statements about its culture and its code of ethics to be immaterial puffery, the Court finds persuasive Judge Tigar's analysis, in a Northern District of California case, of fraud claims challenging similar statements.  In *Retail Wholesale & Department Store Union Local 338 Retirement Fund v. Hewlett-Packard Co.*, Hewlett-Packard ("HP") had made public statements, in the wake of an ethics scandal, regarding its commitment to its Standards of Business Conduct ("SBC").  52 F. Supp. 3d 961, 964–66 (N.D. Cal. 2014).  HP repeatedly stated that its ethics policies applied to all employees and board members.  *Id.* at 965.  Plaintiff investors claimed that these statements contained material misstatements of fact after HP's CEO resigned amid revelations that, at the time these statements were made, he had misrepresented to the Board his relationship with an independent consultant to the company, had filed inaccurate expense reports for illegitimate expenses to conceal that relationship, and the consultant had alleged that the CEO sexually harassed her.  *Id.* at 966–67.

Judge Tigar held that, notwithstanding the outsized importance that issues of corporate integrity assumed at the time at HP, the company's statements about its ethics policies were not

material.  *Id.* at 969.  "[A] code of ethics," he noted, "is inherently aspirational; it simply cannot

be that every time a violation of that code occurs, a company is liable under federal law for

having chosen to adopt the code at all, particularly when the adoption of such a code is

effectively mandatory."  *Id.* at 970 (quoting *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505

F. Supp. 2d 662, 685–86 (D. Colo. 2007)) (internal quotation marks omitted).  Judge Tigar also

rejected plaintiff's theory that HP's statements were materially false by omission because of their

failure to disclose conduct by the CEO that, if disclosed, was likely to prompt his resignation.

*Id.* at 971.  Finding that HP did not have an affirmative duty to disclose the misconduct, Judge

Tigar held that the CEO and HP were "not required to disclose [the CEO's] misconduct to make

those representations not misleading, because the representations were not material in the first

place."  *Id.* at 971–72.

The broad statements by CTPartners that plaintiff attacks here are immaterial puffery for

much the same reasons given by Judge Tigar.  Plaintiff argues that this case is different because

CTPartners itself claimed that its culture and reputation were key to its success, such that when

its culture was revealed to be "diametrically opposed to its public persona, its stock imploded."

Pl. Br. 11.  But the importance of CTPartner's culture and reputation to its success does not mean

that any statement lauding these intangibles was material under the securities laws.  As noted, the

relevant inquiry instead must consider whether the statement made was sufficiently specific that

a reasonable investor could rely on it as a "guarantee of some concrete fact or outcome," and the

statements challenged here are not.  *UBS*, 752 F.3d at 185 ("[W]hile importance is undoubtedly a

*necessary* element of materiality, importance and materiality are not synonymous." (footnote

omitted)); *see also JP Morgan*, 553 F.3d at 206 ("While a bank's reputation is undeniably

important, that does not render a particular statement by a bank regarding its integrity per se material.").

Plaintiff's characterization of these issues as going to CTPartners' "core business—its search consultants and their support staff—" and in the context of a search firm as opposed to a larger financial institution, Pl. Br. 12–13 (emphasis omitted), does not alter this outcome.  The key issue is not whether the topic of a statement was a key to corporate success, but the nature of the specific statement and whether it concretely assured investors of anything.  *See Bahash*, 506 F. App'x at 37 (explaining that statements' designation as puffery "stems from the generic, indefinite nature of the statements at issue, not their scope," and holding statements that plaintiff claimed were "directly related" to the company's core business to be puffery) (internal quotation marks omitted)).

That the market reacted adversely to the *NY Post* article's exposure of Sullivan's naked romp and the related failings at CTPartners does not, therefore, mean that the Company's prior statements generally celebrating its culture are actionable.  As to this point, the Fourth Circuit's decision in a case holding that a lie by a CEO inflating his educational background was not a material fact that gave rise to liability is instructive.  The securities laws, the Fourth Circuit explained, "decidedly do *not* prohibit *any* misrepresentation—no matter how willful, objectionable, or flatly false—of *im*material facts, even if it induces reactions from investors that, in hindsight or otherwise, make the misrepresentation appear material."  *Greenhouse v. MGC Capital Corp.*, 392 F.3d 650, 656 (4th Cir. 2004) (emphasis in original).  Nor did the statement become material because the lie implicated the CEO's, and therefore the company's, integrity.  *Id.* at 659–60.

Plaintiff, finally, argues that CTPartners' statements regarding compliance with law and ethical policies are actionable because they are "directly at odds with [the defendants'] alleged conduct."  Pl. Br. 11 (quoting *In re Goldman Sachs Grp. Inc. Sec. Litig.*, 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014)); *citing also Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 279–80 (S.D.N.Y. 2012); *Lapin v. Goldman Sachs Grp. Inc.*, 506 F. Supp. 2d 221, 240–241 (S.D.N.Y. 2006)).  There is indeed language in the *Goldman Sachs* cases to the effect that Goldman's general statements that it complied with the law and that its "integrity 'was at the heart' of its business" were actionable.  *Lapin*, 506 F. Supp. 2d at 240; *see also Richman*, 868 F. Supp. 2d at 279–80 ("Goldman must not be allowed to pass off its repeated assertions that it complies with the letter and spirit of the law, values its reputation, and is able to address 'potential' conflicts of interest as mere puffery or statements of opinion.")  But those cases are distinguishable because those statements did not exist in isolation:  As alleged, Goldman had contemporaneously made statements that more directly, and concretely, contradicted facts alleged to be known to it.  *See In re Goldman Sachs*, 2014 WL 2815571, at *5 (denying reconsideration and reaffirming *Richman* because Goldman's statements that it "ha[d] extensive procedures and controls that are designed to . . . address conflicts of interest" was directly contrary to its alleged engagement in conflicted transactions (ellipses in original) (internal quotation marks omitted)); *Lapin*, 506 F. Supp. 2d at 240 (noting that complaint "does more than identify rosy predictions or vague statements about Goldman's integrity," specifically, that the company was trying to distinguish itself from competitors through its "truly independent investment research" which was alleged to be, in reality, not actually independent (internal quotation marks omitted)).  Here, the challenged statements by CTPartners about its culture, reputation, and compliance were made at a highly general level.  They do not address any

24

concrete policy or practice, let alone policies or practices aimed at preventing workplace hostility or discrimination that would make them analogous to those held actionable in the *Goldman* cases.

For these reasons, the Court holds, of the statements regarding corporate culture identified in the Amended Complaint, all—save those pertaining to the Company's low voluntary turnover rate—are immaterial puffery, and therefore are not actionable under the securities laws.

### 2.    False or Misleading Statements or Omissions

Plaintiff argues that the Company's statements lauding its culture were materially false and misleading because the Company did not disclose contrary information, to wit, its allegedly discriminatory and hostile treatment of women employees.  *See, e.g.*, AC ¶ 70(a).  The Court has already held most of these statements non-actionable as puffery.  But the Company's statements about its low voluntary turnover rate are factual, not puffery.  Therefore, the Court considers the adequacy of plaintiff's claims that these statements were false or misleading.

Plaintiff argues that these statements were misleading because the Company "omitted material facts concerning the Company's pattern and practice of firing female partners and employees."  *See, e.g.*, *id.* ¶ 74(b).  Defendants counter that the statements are not themselves claimed to be inherently false or misleading, and that plaintiff has not pled any omitted facts that would make them so.  Def. Br. 9–10.  Defendants also argue that, in attempting to plead such facts, plaintiff relies upon unreliable sources, namely, the *NY Post* article and the statements of confidential witnesses.  *Id.* at 10–11.

As to sourcing, Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  To do so, a plaintiff is permitted to rely on newspaper articles, provided that the reports themselves

"indicate particularized facts . . . in order to support Plaintiffs' claims." *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 586 (S.D.N.Y. 2007); *see also In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) ("[N]ewspaper articles should be credited only to the extent that other factual allegations would be—if they are sufficiently particular and detailed to indicate their reliability.  Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel.").  A plaintiff may also rely on confidential sources, *i.e.*, persons identified other than by name.  *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) ("[T]he PSLRA does not require confidential sources to be named in the complaint.  A complaint may rely on information from confidential witnesses if 'they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)).[7]

The Amended Complaint adequately pleads facts that appear to reliably allege that a sizable number of female employees involuntarily left the Company—*i.e.*, were fired.  One former employee, FE2, who is described as having been a partner at CTPartners in 2011 and 2012, is quoted as saying that "she was the thirteenth woman over forty years old who was let go from the Company" in the 18 months prior to her termination.  AC ¶ 54 (emphasis omitted).  She is further quoted as stating that "there were a lot of women let go from the Company, but very

---

[7] In *In re Millennial Media, Inc. Sec. Litig.*, No. 14 Civ. 7923 (PAE), 2015 WL 3443918, at *11, 14 (S.D.N.Y. May 29, 2015), this Court articulated certain best practices for counsel who propose to rely on confidential sources.  These include "attempt[ing] to confirm with the witness the statements that counsel proposes to attribute to him" so as "to assure that the Complaint is presenting these statements in fair context," and notifying the interviewee that counsel proposes to designate him as a confidential witness and that this designation runs the risk of eventual exposure of the interviewee.  Plaintiff's counsel represents that it complied with these practices. *See* Pl. Br. 17–18.

few people resigned." *Id.* ¶ 56.  Another former partner, FE3, is quoted as stating that there were

10 to 12 female partners at the Company's New York office when she arrived there in 2011, but

only half that many when she left three years later, and as stating that most of the women who

left were over 40 years old.  *Id.* ¶ 57.  The Court assumes *arguendo* that FE2 and FE3 were in a

position to know the facts of these departure metrics, as this inference fairly—although by no

means assuredly—follows from their status as partners.  The allegations do not, however,

permit—or even come close to permitting—a non-speculative inference as to the reasons for

these departures.  The data pled is just that—data.  As pled, it provides no insight as to the

circumstances underlying any individual departure.  And it does not enable one to conclude

whether these departures were connected or separate events; whether they had common or

separate causes; whether they were justified or not; or, as to any departure, whether it was

attributable to actual or perceived performance issues, other valid workplace considerations, or

gender discrimination.[8]  The facts alleged in the Amended Complaint are far too sparse to

support a claim of discriminatory termination.  *See, e.g.*, *Patane v. Clark*, 508 F.3d 106, 112 (2d

Cir. 2007) (complaint did not "set forth any factual circumstances from which a gender-based

---

[8] Plaintiff separately relies on a statement in the *NY Post* article to the effect that, according to the confidential EEOC complaint, women "were let go even if they brought in more money than male counterparts."  AC ¶ 6.  The article, however, provides no basis on which a reader could possibly evaluate the reliability of that factual claim.  The article does not disclose the identity of the EEOC complainant or the factual basis on which that individual was in a position to know the facts necessary to make the complainant's generalization true.  The article's representation that the Company engaged in gender-disparate termination practices therefore cannot be credited as factually accurate on this motion to dismiss.  *See In re McKesson HBOC*, 126 F. Supp. 2d at 1272.  Similarly deficient is FE2's claim that "there were men who had not billed in two or three years yet were not let go, whereas women who had billed $300,000 to $500,000 were let go and denied commissions."  AC ¶ 56.  The Amended Complaint does not explain what if any factual basis FE2 relied upon in making this claim, including how FE2 knew what the billings were of these other partners, male and female.  *See Blanford*, 794 F.3d at 305.

motivation for [an adverse employment] action might be inferred"); *Novak v. Waterfront Comm'n of N.Y. Harbor*, 928 F. Supp. 2d 723, 729 (S.D.N.Y. 2013) (same).

Significantly here, the issue is whether omission of this data renders false or misleading CTPartners' public statements about its low *voluntary* turnover rate. It does not. Simply put, voluntary and involuntary turnover are different concepts. The Company could have chosen to disclose its overall turnover rate as a means to convey an impressive continuity of employees. But it did not do so. And the statement the Company made does not convey that fact. Rather, the Company's statement solely addressed *voluntary* turnover, meaning the incidence of elective departures by employees. *See, e.g.*, AC ¶ 90 ("We ask [our employees] to do one thing, great search execution. That's why they join us and that's why they stay."). That a particular quantum of employees were terminated during the relevant time period—for whatever reason, merit-based or not, proper or improper—does not render misleading the Company's statement that it had a low *voluntary* turnover rate.

Put differently, the thrust of CTPartners' public statements was that the Company did not have a problem of a large number of desired employees *choosing* to leave the Company, a circumstance which presumably might hamstring CTPartners' future prospects. That the Company on its own chose to cashier various employees does not render those public statements false or misleading.

The Court therefore holds that CTPartners' statements regarding its low voluntary turnover rate were not, on the facts pled in the Amended Complaint, false or misleading. They therefore do not support plaintiff's claim of securities fraud.

### 3.    Affirmative Disclosure Obligations Under Item 303

Plaintiff next argues that, even if disclosure of the allegedly offensive work environment at CTPartners was not required to make the Company's other statements accurate, the Company

28

had a freestanding affirmative duty to disclose these matters under Item 303 of Regulation S–K,

17 C.F.R. § 229.303 ("Item 303"), issued by the SEC.  Item 303 "outlines the disclosure required

in the 'Management's discussion and analysis of financial condition and results of operations'

section ('MD&A') in certain corporate filings."  *In re Canandaigua Sec. Litig.*, 944 F. Supp.

1202, 1209 (S.D.N.Y. 1996).  The Second Circuit has held that "Item 303's affirmative duty to

disclose . . . can serve as the basis for a securities fraud claim under Section 10(b)" of the

Exchange Act.  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015).[9]  The

Court addresses first the matters that Item 303 requires to be disclosed, and then applies these

concepts to this case.

Item 303 requires a company to "describe any known trends or uncertainties that have

had or that the registrant reasonably expects will have a material favorable or unfavorable impact

on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).

"Instruction 3 to paragraph 303(a) provides that '[t]he discussion and analysis shall focus

specifically on material events and uncertainties known to management that would cause

reported financial information not to be necessarily indicative of future operating results or of

future financial condition.'"  *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120

(2d Cir. 2012) (quoting 17 C.F.R. § 229.303(a) instruction 3) (alteration in original).

The SEC has provided guidance as to when Item 303's disclosure obligation is triggered.

Disclosure, it has stated, "is necessary 'where a trend, demand, commitment, event or uncertainty

is both presently known to management and reasonably likely to have material effects on the

registrant's financial conditions or results of operations.'"  *Stratte-McClure*, 776 F.3d at 101

---

[9] An issuer's failure to comply with Item 303, of course, is not itself sufficient to state a claim
under Section 10(b).  A plaintiff must also plead the other required elements of a Section 10(b)
claim.  *See Stratte-McClure*, 776 F.3d at 102–03.

(quoting Management's Discussion and Analysis of Financial Condition and Results of Operations, Exchange Act Release No. 6835, 43 S.E.C. Docket 1330, 1989 WL 1092885, at *4 (May 18, 1989) ("Exchange Act Release No. 6835")).

Here, plaintiff argues that CTPartners was obligated, under Item 303, to affirmatively disclose in its SEC filings "the true nature" of the Company's "systemic" hostility to women and its hostile work environment.  AC ¶¶ 75, 84, 92, 99, 104.  Plaintiff argues that the filings that ought to have included such a disclosure were the Company's 10-K and 10-Q reports for the full fiscal year 2013 through the third quarter of 2014, issued between March 12, 2014 and November 6, 2014, and its preliminary prospectus issued in connection with its proposed (although never completed) stock offering on December 8, 2014.  *Id.*  Plaintiff argues that Item 303 applies because the Company's discriminatory "practices, and the internal complaints regarding those practices, provided a presently existing trend, event, or uncertainty that reasonably would be expected to have a material adverse impact on the Company's revenue streams if it ever came to light, as in fact occurred."  Pl. Br. 21; *see also* AC ¶ 75 (the "true nature" of the Company's practices was required to be disclosed because "it was an uncertainty that would (and did) have an unfavorable impact on CTPartners' sales, revenues and income from operations").

The Court rejects this argument.  On the facts pled, CTPartners did not have an affirmative obligation, under Item 303, to disclose its allegedly coarse and unsavory work environment.  However hostile CTPartners' workspace may have been to women—and treating the facts alleged as true, the environment at the Company could potentially have qualified as hostile under federal, state, and/or local anti-discrimination laws—such matters are outside the scope of what Item 303 requires be disclosed.  That is because the Amended Complaint has not

adequately pled the existence of an uncertainty that was both "presently known to management" and "reasonably likely to have material effects on the registrant's financial conditions or results of operations," as required by Item 303.

First, the information that plaintiff argues should have been disclosed—the offensive behavior of certain CTPartners' executives, such as Sullivan's "naked romp" at the company retreat and St. John's use of phallic imagery in discussions with female employees—does not pertain to the Company's operational results or financial condition.  Plaintiff's thesis that the executives' boorish behavior would ultimately impact the bottom line instead requires one to have foreseen, essentially, that this behavior would be scandalously revealed, as it was in the *New York Post*, and provoke such executive suite turbulence so as to impair the Company's financial condition or operational results.  Except with the benefit of hindsight, that scenario was speculative and conjectural.  As Judge Pollack has persuasively explained, Item 303 is aimed instead at more quotidian matters—trends and uncertainties related to a company's "financial condition and operational results."  *In re Canandaigua Sec. Litig.*, 944 F. Supp. at 1210; *see id.* at 1210–11 (discussing language of the regulation, including Instructions 1 and 3, the former of which provides that "the discussion [in the MD&A section] 'shall be of the financial statements and of other statistical data'" (quoting 17 C.F.R. § 229.303(a) instruction 1), and the SEC's interpretive guidance); *see also In re Authentidate Holding Corp. Sec. Litig.*, No. 05 Civ. 5323 (LTS), 2009 WL 755360, at *3 (S.D.N.Y. Mar. 23, 2009) (holding omission of information not actionable under Item 303 because it did not "cause[] any piece of existing 'reported financial information' to misleadingly indicate a specific future result or financial condition."), *aff'd in part, vacated in part on other grounds, remanded sub nom. Ill. State Bd. of Inv. v. Authentidate Holding Corp.*, 369 F. App'x 260 (2d Cir. 2010) (summary order).

Applying these principles in *In re Canandaigua*, Judge Pollack held that a company's new marketing and pricing strategy was not itself required to be disclosed because it did not fall within the "cognizable, definitive limits to the disclosure required by [Item] 303." 944 F. Supp. at 1210. As he explained: "There is a significant difference between events and trends affecting 'operations,' such as the closure of a plant or the increase in costs of raw materials, and competitive marketing strategies and plans." *Id.* at 1210–11.

Similarly here, CTPartners was not required to disclose information about its alleged hostility and insensitivity to women, such as Sullivan's habit of swimming in his birthday—rather than his bathing—suit at the Company's seaside gathering, however unhappily the investing public would have received news of the CEO and other executives' unadorned public gambols.[10] While Sullivan's and others' workplace derelictions as alleged merit condemnation, they did not impact the Company's operations and had no prospect of doing so—unless they were disclosed. In the terms of Item 303 as interpreted by the SEC, the executives' personal failings had had no evident bearing on CTPartners' financial condition or performance at the time of its financial statements, or, indeed, at any time until December 2014, when they were revealed by the *New York Post*. Indeed, plaintiff himself alleges that Sullivan's "naked romps" and other forms of employment discrimination were a "long-standing" practice, *e.g.*, AC ¶ 70(a), and implicitly concedes that, prior to the *Post*'s expose, they had had no impact on the Company's operations, *see* Pl. Br. 21.

This case therefore is a far cry from the two cases in which the Second Circuit has held Item 303, on the pleadings, potentially to require disclosure. In each, the plaintiff had adequately

---

[10] While the *NY Post* article references only Sullivan's May 2012 naked run, FE2, a former partner at the Company from 2011 to 2012, described the naked run as a "'ritual' that Sullivan and 'her bosses' did 'in front of everyone' at the yearly global partner meeting." AC ¶ 64.

pled known, but undisclosed, trends in market conditions which were reasonably likely to have a direct, material impact on the company's revenues due to their particular holdings.  The Circuit therefore held that, on the facts pled, the companies were obliged to disclose the "potential future impact" of the known trend.  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 719 (2d Cir. 2011) (emphasis in original) (plaintiffs adequately pled existing trend, event, or uncertainty by alleging "that the downward trend in the real estate market was already known and existing at the time of [Blackstone's] IPO and that the trend or uncertainty in the market was reasonably likely to have a material impact on [its] financial condition," *id.* at 716); *Stratte-McClure*, 776 F.3d at 104 (plaintiff adequately pled that Morgan Stanley "faced a deteriorating subprime mortgage market that, in light of the company's exposure to the market, was likely to cause trading losses that would materially affect the company's financial condition").

More closely on point is *In re Canandaigua*, where disclosure was held not required, although even there, the undisclosed information (a new marketing and pricing strategy) had a far tighter nexus to the defendant company's financial performance.  In holding that Item 303 did not require disclosure of that strategy, Judge Pollack reasoned, *inter alia*, that "courts have been sensitive about forcing a company to damage its own interests as well as those of its shareholders by revealing competitive information."  944 F. Supp. at 1211 (citing *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 809 (2d Cir. 1996)).  So too, here.  While revelation by CTPartners of its executives' vulgar behavior would not reveal information that would aid competitors in how to conduct an executive-search business, it would surely have "damaged [the Company's] own interests," including harming its reputation with potential clients and placements.  As in *In re Canandaigua*, plaintiff's claim of a regulatory disclosure obligation thus "stretch[es] the language of [Item] 303 beyond its legitimate scope."

944 F. Supp. at 1212.  Simply put, CTPartners did not have an affirmative obligation under this financial regulation to reveal its executives' dirty laundry.

Second, even if the information in question—the existence of repugnant behavior towards female employees and allegedly discriminatory workplace practices—was of the sort required to be disclosed under Item 303, plaintiff has not adequately pled that at any relevant time there was a *known* uncertainty.  Yet, to trigger the regulation, such a known uncertainty is required. Plaintiff argues that the various practices alleged, and the fact that there had been internal complaints about some of them, were a presently existing trend, event, or uncertainty, because these practices put at risk the Company's reputation and revenue streams "*if it ever came to light*."  Pl. Br. 21 (emphasis added).  But this argument puts the cart before the horse.  It was entirely speculative that disclosure of the executives' bad behavior would ever come to light, let alone that this revelation would be revealed in a forum and manner that would badly damage CTPartners' earnings or revenue.  Plaintiff's argument—effectively that the *NY Post* article and the debilitating scandal that followed were a matter of "when and not if"—gains traction only by hindsight.

Relevant too as to this point, the SEC has underscored the key distinction between those disclosures of prospective information that are required and the forward-looking statements that may be voluntarily made but are not required.  Its guidance states:

> The distinction . . . rests with the nature of the prediction required.  Required disclosure is based on *currently known trends, events, and uncertainties that are reasonably expected to have material effects*, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.  In contrast, optional forward-looking disclosure involves *anticipating a future trend or event or anticipating a less predictable impact of a known event, trend, or uncertainty.*

Exchange Act Release No. 6835, 1989 WL 1092885, at *4 (quoting Concept Release on Management's Discussion and Analysis of Financial Condition and Operations, 52 FR 13715-02, 13717 (April 24, 1987) ("Securities Act Release No. 6711")); *see also In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 507 (S.D.N.Y. 2013) (quoting this portion of the interpretive guidance).

By this measure, too, no disclosure was obligatory here.  That the indiscretions by CEO Sullivan and others would one day be publicly revealed is the sort of "future trend or event" whose disclosure, while certainly permitted, was not required under Item 303.  Exchange Act Release No. 6835, 1989 WL 1092885, at *4 (quoting Securities Act Release No. 6711, at 13717) (emphasis omitted).  The information plaintiff argues was required to be disclosed stands in stark contrast to the types of known uncertainties contemplated by the regulation and subjected to required disclosure.  For example, the SEC has described a company that knows that "a material government contract is about to expire."  *Id.* at *5.  The company knows that there is uncertainty whether the contract will be renewed; it may, further, have information bearing on whether renewal is likely, and "factual information relevant to the financial impact of non-renewal upon the registrant."  *Id.*  Such a company, unlike one speculatively "anticipating a future event," knows of a present or imminent uncertainty—because the contract is about to expire—and possesses factual information that allows it to assess the uncertainty and its potential impact on the company.  This scenario is a far cry from that here.

The Second Circuit's recent decision in *Panther Partners*, applying Item 303, is, finally, also far afield from the circumstances here.  There, the Circuit held, the plaintiff had sufficiently pled a known uncertainty regarding possible returns of products with *known* defects.  681 F.3d at 121–22.  In that case, a semiconductor chip manufacturer had been receiving an increasing

number of complaints from its two largest customers—who accounted for 72% of its revenue—
of defective chips; the company knew it would be unable to determine which chips sold were
defective. *Id.* The Circuit therefore held that there was a known uncertainty about whether the
company would need to accept returns of substantial volumes, or all, of its chips sold, requiring
disclosure. *Id.*

Here, by contrast, plaintiff asserts that defendants were required to disclose information
about allegedly deleterious practices bearing on workplace culture and the potential impact of
this information on the Company, based on the speculative possibility that an event (disclosure
by an outsider, such as a tabloid newspaper) might one day occur. But plaintiff has not
adequately alleged that the defendants *knew* a public revelation was forthcoming. *See In re Noah
Educ. Holdings, Ltd. Sec. Litig.*, No. 08 Civ. 9203 (RJS), 2010 WL 1372709, at *6 (S.D.N.Y.
Mar. 31, 2010) ("Knowledge of a trend [or uncertainty] is an essential element triggering
disclosure under Item 303." (citing *Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, No. 07
Civ. 10528 (RWS), 2010 WL 148617, at *9 (S.D.N.Y. Jan.14, 2010))). At the time the
Company filed its 10-K and 10-Q forms (on March 12, 2014, May 8, 2014, July 30, 2014, and
November 6, 2014), the Amended Complaint asserts only that (1) Company executives were at
most aware of Sullivan's seaside indiscretions, (2) internal complaints of sexual harassment at
the New York office (though evidently unrelated to Sullivan) had been made in 2012, AC ¶ 6
(quoting *NY Post* article), and (3) Company executives had been "informed of concerns by an
employee" by August 2014, *id.* ¶ 144. These allegations fall far short of supporting a claim that
CTPartners, or any executive, knew of an impending public exposure. *See In re Bank of Am.
AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 572–74, 584 (S.D.N.Y. 2013) (Item 303 did not
require disclosure of imminence of lawsuit because lawsuit's eventual filing had not been alleged

to be presently known by the company, notwithstanding ongoing, pre-litigation settlement discussions), *aff'd*, 566 F. App'x 93 (2d Cir. 2014) (summary order).

Indeed, the Amended Complaint alleges that defendants appreciated that some form of public revelation was imminent only just before the Company's filing of the December 8, 2014 preliminary prospectus, early in the morning of the day the *NY Post* article appeared.  It alleges that CTPartners became aware of the forthcoming *NY Post* article by the preceding Friday, December 5, 2014.  AC ¶¶ 9, 108.[11]  When the preliminary prospectus was issued, the allegations of Sullivan's misdeeds and the other alleged improprieties had already been, or were nearly simultaneously being, disclosed to the public.[12]  But even at that point, CTPartners had no basis for assessing, and thus disclosing, the uncertainty as to the *impact* the imminent *NY Post* article would have on its operations and revenues.  Therefore, any statement that the Company could then have made on the subject would have been a voluntary forward-looking one, rather than a required disclosure under Item 303.  *See* Exchange Act Release No. 6835, 1989 WL 1092885, at *4 (quoting Securities Act Release No. 6711) (an "optional forward-looking disclosure involves . . . *anticipating a less predictable impact of a known event, trend, or*

---

[11] The Amended Complaint does not recite the factual basis for this allegation, other than to attribute it to the *NY Post*.  AC ¶ 108.  The *NY Post* article itself does not state when it contacted the Company about the story.  It includes a general statement from Nocifora responding to the allegations.

[12] On the *NY Post* website, the article bears the time stamp of 3:32 a.m. on December 8, 2014, http://nypost.com/2014/12/08/complaint-claims-executives-held-boozy-naked-boys-club-romps (last visited March 28, 2016), and the Company's preliminary prospectus was "accepted" by the SEC's EDGAR system at 7:04 a.m. that same day, https://www.sec.gov/Archives/edgar/data/ 1439199/000119312514435474/0001193125-14-435474-index.htm (last visited March 28, 2016).  "Matters of which judicial notice can be taken include press coverage establishing what information existed in the public domain during periods relevant to the plaintiffs' claims."  *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 570 (citing *Staehr v. Hartford Fin. Serv. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)).

*uncertainty*"); *Litwin*, 634 F.3d at 719 (requiring disclosure of the "potential future *impact*" of a publicly known trend); *cf. In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12 Civ. 8557 (CM), 2013 WL 6233561, at *11 (S.D.N.Y. Dec. 2, 2013) (defendant not required to disclose adverse trends or uncertainties regarding its business relationship with another company because, at the time its registration statement became effective, "there were no problems with [the relationship] that would have been apparent" and "Item 303 imposed no duty . . . to anticipate" problems that would arise in the future).

The Court therefore holds that CTPartners did not have an affirmative duty to disclose information regarding CEO Sullivan's or other executives' inappropriate behavior or allegations regarding the Company's allegedly toxic culture. The failure to disclose that information in the Company's public disclosures does not support a claim for securities fraud.

### B.    Statements Regarding 4Q14 EPS

Plaintiffs separately allege that CTPartners made materially false and misleading statements in a press release regarding its preliminary financial results for the fourth quarter 2014. On January 21, 2015, CTPartners issued a press release that stated that it "expected" its adjusted net income for the quarter "to be in the range of . . . $0.06 to $0.08 per share." Gabriel Decl., Ex. D ("January 21 Press Release") at 5; *see* AC ¶ 114. These results were lower than its earlier guidance of adjusted EPS of $0.19 to $0.21, a reduction which the Company attributed to $1.3 million in "higher than anticipated operating expenses . . . related to business development activity, increased marketing and upgrading the search process and corporate infrastructure." January 21 Press Release at 5; AC ¶ 114. One week later, however, on January 28, 2016, in a second press release, the Company announced that it was "revising its fourth quarter . . . preliminary earnings results previously announced on January 21, 2015," and stated that it "expected" an "adjusted net loss" for the quarter "to be in the range of . . . $0.07 to $0.09 per

share."  Gabriel Decl., Ex. E ("January 28 Press Release") at 6; AC ¶ 121.[13]  It explained that the

"revision is a result of a $1.7 million increase in the Company's estimate of operating expenses

for the fourth quarter primarily due to compensation expense associated with consultant

performance bonuses."  January 28 Press Release at 5; AC ¶ 121.

Plaintiff alleges that the Company's preliminary earnings results for the fourth quarter of

2014 were materially false and misleading because the Company failed then to fully disclose the

financial impact of the revelations by the *NY Post*, in that the "Company had actually suffered an

EPS *loss* for the quarter far below the $0.06 to $0.08 EPS gain" because it "had been forced to

pay excess compensation to keep revenue-generating employees from fleeing en masse."  AC

¶ 117; *see also* Pl. Br. 21, 23.

Plaintiff fails to state a claim based upon the preliminary earnings statements, for two

independent reasons.  First, the statements are not actionable, in light of the "bespeaks caution"

doctrine and the PSLRA's related provision protecting forward-looking statements.  Second, the

Amended Complaint fails to adequately plead that the preliminary earnings results statement was

false or misleading at the time it was made.

The "bespeaks caution" doctrine generally protects forward-looking statements that

adequately disclose the risk factors that might cause a different outcome to occur than the one

then forecast by the issuer.  *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 141

(2d Cir. 2010).  As the Second Circuit has explained, under this doctrine, "[a] forward-looking

statement accompanied by sufficient cautionary language is not actionable because no reasonable

investor could have found the statement materially misleading.  In such circumstances, it cannot

---

[13] The January 28 Press Release also withdrew its earnings guidance for 1Q15 and full fiscal
2015 previously announced in the January 21 Press Release.  January 28 Press Release at 6.

be supposed by a reasonable investor that the future is settled, or unattended by contingency."
*Id.* (footnote and citation omitted).

The PSLRA provides for a similar safe harbor.  It provides that a defendant shall not be
liable for a statement that is "identified as a forward-looking statement, and is accompanied by
meaningful cautionary statements identifying important factors that could cause actual results to
differ materially from those in the forward-looking statement."  *Slayton*, 604 F.3d at 765
(quoting 15 U.S.C. § 78u–5(c)).  This provision is a "counterpart" to the bespeaks caution
doctrine.  *Rombach*, 355 F.3d at 173.

The Company's preliminary earnings statements meet these requirements.  First, the
statements of preliminary earnings results were forward-looking and were explicitly identified as
such.  At the end of the January 21, 2015 press release, CTPartners stated that the release
contained forward-looking statements, which could be "identified by the use of forward looking
terminology such as . . . 'expects.'"  January 21 Press Release at 7–8.  As noted, in announcing
its preliminary earnings results, the release said that the Company "expected" earnings per share
of $0.06 to $0.08 per share for 4Q14.  *Id.* at 5; *see Slayton*, 604 F.3d at 769 (statement was
forward-looking and identified as such through the use of the word "expect").  Second, the
statement was accompanied by meaningful cautionary statements.  The press release identified
"various risks and uncertainties" that, if they materialized, could cause "actual results [to] vary
materially from those indicated in these statements."  January 21 Press Release at 8.  Among
those identified risks were the Company's "ability to forecast, on a quarterly basis, variable
compensation accruals that ultimately are determined based on the achievement of annual
results."  *Id.*

Plaintiff disputes that these statements merit protection under the safe harbors for two reasons.

First, plaintiff disputes that the preliminary results qualify as a forward-looking statement, because they addressed a quarter that was complete. Pl. Br. 21–22. That is incorrect. That a quarter has concluded does not mean that the quarter's results have yet been tabulated. Both the PSLRA, and the Second Circuit applying the bespeaks caution doctrine, treat as covered by the safe harbor corporate statements of projections as to corporate earnings, without regard to whether the last day of the covered earnings period had passed. *See Slayton*, 604 F.3d at 766–67 ("The PSLRA includes several definitions of a forward-looking statement, including 'a statement containing a projection of . . . income (including income loss), earnings (including earnings loss) per share, . . . or other financial items' and 'a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management . . . .'" (quoting 15 U.S.C. § 78u–5(i)(1)(A) & (C)) (alterations in original)); *MF Global*, 620 F.3d at 143 ("[T]here is a discernible difference between a forecast and a fact . . . . A forward-looking statement . . . expresses the issuer's inherently contingent prediction of risk or future cash flow; a non-forward-looking statement provides an ascertainable or verifiable basis for the investor to make his own prediction.")

Here, CTPartners' preliminary results statement was a forward-looking projection, insofar as it gave a "preliminary" calculation of what the final quarterly financial results *would be* "based on currently available financial and operating information and management's preliminary analysis of the unaudited financial results for the quarter." January 21 Press Release at 5. In other words, the preliminary results were a prediction, based on incomplete or provisional information, of what the Company would ultimately declare its financial

41

performance to have been.  *See In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1163 (C.D. Cal. 2003) (holding that preliminary earnings statements for a recently completed financial quarter were forward-looking for the purposes of the PSLRA safe harbor).

Second, plaintiff argues that the preliminary earnings statement is not protected by the safe harbor, because the projections allegedly misstated a historical fact and because the Company allegedly already knew that the risks of which it warned had become reality.  Pl. Br. 22.  The PSLRA and bespeaks caution doctrine indeed do not preclude liability for a statement warning of a risk that a company knows has already transpired.  *See In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003) (statements unprotected where defendants "had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality"); *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").  Further, where the forward-looking language "did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss," such cautionary language does not insulate a defendant.  *Halperin*, 295 F.3d at 359.

Here, however, the Amended Complaint does not adequately plead facts sufficient to support plaintiff's claims that that the forward-looking preliminary earnings statement misstated historical facts, or warned (or failed to warn) of a risk that had already materialized.  And for this same reason, even if the Company's preliminary statement of 4Q14 earnings were not protected as forward-looking, plaintiff would still have failed to state a claim of a statement that was false or misleading when made.  The Court addresses these scenarios in turn.

As to whether the preliminary statement of earnings misstated a historical fact, it does not suffice for plaintiff simply to point to the fact that, a week later, the projection was revised from a gain ($0.06 to $0.08 per share) to a loss ($0.07 to $0.09 per share). This circumstance does not show that the Company knew, at the time of the preliminary release, what the ultimate earnings data would reveal. Plaintiff's contrary claim, that "[t]here can be no serious question that Defendants' January 21, 2015 announcement of preliminary adjusted EPS for the fourth quarter was materially false and misleading at the time it was made," Pl. Br. 21, is an *ipse dixit*. The fact of a later correction, made a short time after an initial statement is made, does not connote that that the Company's earlier statement about its earnings expectations was false or misleading when made. *See UBS*, 752 F.3d at 188 ("We do not recognize allegations of fraud by hindsight." (internal quotation marks and citations omitted)). Tellingly, the Amended Complaint does not plead any facts supporting plaintiff's claim that as of January 21, 2015, CTPartners already knew of the facts that a week later required a downward revision.

As to whether a specific risk had already materialized as of January 21, 2015 as opposed to merely being a possibility, the parties offer different explanations as to what led the Company to revise its preliminary results. The Company explained its revision as arising from a change in the Company's own estimate of its consultants' bonuses, based on the difficulty of estimating on a quarterly basis bonuses that are determined based on annual year-end results. January 28 Press Release at 6; AC ¶ 121. This was a risk, in fact, that was explicitly, identified in the Janaury 21, 2015 release. January 21 Press Release at 8; Def. Br. 17–18. Plaintiff offers an alternative theory: He suggests that, after the *NY Post* article, CTPartners determined to pay its search consultants high bonuses in order to keep them from fleeing the Company. Pl. Br. 23 & n.13. Plaintiff argues that the decision to pay enhanced bonuses is the "only reasonable inference" that

can be drawn to explain the "sudden and unexpected increase in employee compensation." *Id.*
23 n.13.  He notes that the Company later acknowledged that it lost a large number of employees
after the article, *see* AC ¶¶ 132 (between December 31, 2014 and April 16, 2015, the Company
lost 15 consultants, including two who were top 10 revenue earners); 134 (by May 21, 2015, the
tally of departing consultants had increased to 30), and also relies on a statement by an individual
who made a takeover offer for CTPartners to the effect that high bonuses and large shareholder
losses don't typically "coincide," *id.* ¶ 124 (internal quotation mark omitted).

Plaintiff's theory—of a secret decision to pay enhanced bonus compensation in the wake
of the *NY Post* article—fails to support a claim for securities fraud because, quite simply, it is
complete conjecture.  Plaintiff does not point to any concrete evidence, such as a statement by a
witness with personal knowledge, indicative of such a decision.  On the contrary, to construct
this theory, plaintiff cherry-picks from the revised preliminary results insofar as they identify a
loss in 4Q14, but chooses to ignore the explanation in the same revised results as to the basis for
the revision.  This self-serving speculation falls far short of a plausible pleading, let alone one
that satisfies Rule 9(b)'s requirement that fraud be pled with particularity.  *See ATSI*, 493 F.3d at
99.  Further, as important, the Amended Complaint does not plead any particularized facts to the
effect that the size of the additional bonuses (whether pursuant to a preexisting bonus plan or the
newly conceived retention bonuses that plaintiff imagines) were known at the time of the January
21, 2016 press release.  And to the extent that plaintiff faults the Company for not appreciating
earlier that bonuses might prove higher than initially calculated, such a delayed realization does
not support a claim of fraud.  *See Novak*, 216 F.3d at 309 ("[A]llegations that defendants should

have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.").

CTPartners' statement of its preliminary 4Q14 earnings in the January 21 Press Release cannot support liability for securities fraud.[14]

***

For the foregoing reasons, the Amended Complaint fails to plead that CTPartners made an untrue statement of a material fact, or failed to state a material fact necessary to make a statement not misleading or reveal information it had an affirmative duty to disclose.  The Court,

---

[14] Defendants alternatively argue that the revision of its statement of preliminary earnings for 4Q14 was quantitatively immaterial.  *See* Def. Br. 18–19.  In light of the Court's dismissal on other grounds, the Court has no occasion to reach this issue.

Separately, the Court notes some imprecision in defendants' submissions as to a different claim by plaintiffs of an infirmity in the January 21 Press Release.  The Amended Complaint appears to allege that that release was actionable because both the 4Q14 results *and* the 2015 guidance were false and misleading.  AC ¶ 117 (referring to both ¶ 114, stating 4Q14 results, and ¶ 115, stating 2015 guidance, as false and misleading).  Defendants' motion to dismiss, however, explicitly addresses only the former.  It states, after arguing why the culture-related statements are not actionable, that:  "The *only other basis* plaintiff offers to support his section 10(b) claim is a statement regarding CTPartners' preliminary unaudited financial results for the fourth quarter of 2014."  Def. Br. 15 (emphasis added).  It is clear to the Court that defendants intended to seek dismissal of all claims, but unclear is why defendants' motion to dismiss did not appreciate that the Amended Complaint also challenged the Company's 2015 guidance.  Plaintiff, for his part, in opposing the motion to dismiss, did not defend that allegation.  Rather, plaintiff responded to the defendants' motion by defending only its claims as to the 4Q14 portion of the January 21 Press Release.  Plaintiff did not contradict defendants' assertion that this was the "only other basis" for plaintiff's asserted claims.  *See* Pl. Br. 21–23 (using the section header, "Defendants' Statements Regarding 4Q14 EPS Are Actionable").  It is, however, clear that any claim of securities fraud based on the Company's 1Q15 or full fiscal 2015 earnings guidance would fail for the same reasons as addressed in connection with the 4Q14 preliminary earnings statements.  The 2015 earnings per share guidance is forward-looking and identified as such, and accompanied by meaningful cautionary language setting out specifically various risks and uncertainties that might lead the actual results to differ materially from the guidance.  And the Amended Complaint does not allege any concrete facts to support the claim that the guidance lacked an adequate basis at the time it was given.  Instead, plaintiff's theory as to such guidance is transparently based on a theory of "fraud from hindsight" based on the Company's later withdrawal of that guidance.

therefore, holds that plaintiff has not stated a claim for a violation of Section 10(b) of the Exchange Act, or its implementing rule, Rule 10b–5.  In light of this ruling, the Court has no occasion to address defendants' alternative basis for dismissal, based on alleged deficiencies in plaintiff's pleadings as to scienter.[15]

### C.    Section 20(a) Claims

Plaintiff also brings claims against Keneally and Sullivan for violations of § 20(a) of the Exchange Act in their capacities as controlling persons of CTPartners.  AC ¶ 173.  To state a claim under § 20(a), however, a plaintiff must adequately allege "a primary violation by the controlled person." *Barclays*, 750 F.3d at 236 (quoting *ATSI*, 493 F.3d at 108).  Because the Court has held that plaintiff has not done so, plaintiff's claims under § 20(a) must also be dismissed.  *See, e.g.*, *In re Lions Gate Entm't Corp. Sec. Litig.*, No. 14 Civ. 5197 (JGK), 2016 WL 297722, at *18 (S.D.N.Y. Jan. 22, 2016) (dismissing § 20(a) claim based on failure to adequately allege a primary violation).

## IV.    Leave to Replead

Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend a complaint shall be "freely" given when "justice so requires," although a "district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  In its opposition brief, plaintiff seeks leave to replead in the event of dismissal.  Pl. Br. 30.  Plaintiff relies on *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 189–91

---

[15] Were the Court to reach that issue, it notes that defendants have raised substantial questions about the adequacy of the Amended Complaint's pleadings as to scienter, particularly as applied to defendant Keneally.  It is also unclear whether many of the statements relating to corporate culture on which plaintiff relies are properly attributed to Keneally.

(2d Cir. 2015) for the proposition that leave should be granted where the plaintiff has not been given an opportunity to amend the complaint after the issues were fully briefed and decided.

*Loreley* does not control here. There, the district judge utilized a procedure whereby the parties were required to submit short, 3-page letter memoranda in advance of a pre-motion conference in anticipation of a motion to dismiss. *Id.* at 190. The district judge required the plaintiff, before briefing on the motion to dismiss had begun, to either amend and cure the deficiencies in the complaint or forfeit the opportunity to replead. *Id.* The plaintiff forewent repleading and the motion to dismiss was granted, with prejudice. *Id.* Reversing so as to permit repleading, the Second Circuit in *Loreley* stated that the district court's denial of the opportunity to replead pursuant to this procedure was an abuse of discretion. *Id.* at 189–91.

*Loreley* does not, however, require that a plaintiff receive, as a matter of course, repeated judicial decisions on the same motion. The decision "le[ft] unaltered the grounds on which denial of leave to amend has long been held proper, such as undue delay, bad faith, dilatory motive, and futility." *Id.* at 190.

Here, the Court has given plaintiff two opportunities to amend the complaint. First, when setting the briefing schedule for the motion to dismiss, the Court advised plaintiff that while the Court's ordinary practice is to permit plaintiff to file an amended complaint after defendants file a motion to dismiss, it would, in deference to the schedule jointly proposed by the parties, set the deadline for an amended complaint for a date prior to the deadline for defendants' motion to dismiss. The Court advised plaintiff that it should not expect a further opportunity to replead. Dkt. 32 at 6. Second, at the conference scheduled for argument on the motion to dismiss, the Court addressed with plaintiff's counsel his request in its opposition brief for leave to replead in the event of dismissal on the grounds defendant had briefed. Citing *Loreley*, the Court offered

plaintiff an opportunity to amend again, prior to a decision, now that plaintiff had had the benefit of full briefing from the parties.  Tr. 2–6.[16]  The Court stated that it would not allow further amendment after the decision on the motion to dismiss was issued.  *Id.*  Plaintiff's counsel declined to replead.  Counsel instead chose to stand on the Amended Complaint, acknowledging that he was foregoing the opportunity to replead in the event of an adverse decision on the motion to dismiss.  *Id.*  When asked by the Court what, if anything, plaintiff would add to the complaint if given the opportunity to replead, plaintiff represented that he would add information about subsequent developments affecting the Company.  Plaintiff acknowledged that this information would not bear on the theories of liability in the Amended Complaint.  *Id.* at 5–6.

On the present facts, leave to replead is not merited.  Plaintiff has been given multiple opportunities to replead.  And the Court has been given no basis on which to believe that repleading would cure the serious deficiencies in the Amended Complaint identified in this opinion, which in turn track the deficiencies on which defendants sought dismissal.  Denial of leave to amend is permissible "where the request gives no clue as to 'how the complaint's defects would be cured.'"  *Loreley*, 797 F.3d at 190 (quoting *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006)); *see also Hutson v. Notorious B.I.G., LLC*, No. 14 Civ. 2307 (RJS), 2015 WL 9450623, at *8 (S.D.N.Y. Dec. 22, 2015) (denying leave to amend where plaintiff provided only a "cursory request for leave to amend in his Opposition, with no explanation as to how it would cure deficiencies").

Moreover, where the problems with a claim are "substantive" rather than the result of an "inadequately or inartfully pleaded" complaint, an opportunity to replead would be "futile" and

---

[16]  This colloquy occurred immediately before the Court heard argument on the motion to dismiss.

"should be denied." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).  Here, for the reasons noted, the deficiencies in the Amended Complaint are substantive.  The statements that plaintiff calls actionable were not material, or false or misleading, and plaintiff has not identified any omitted information that defendants had an affirmative duty to disclose.  Nor, in its colloquy with the Court, did plaintiff's counsel identify any additional, substantive information it would seek to add to its pleadings that could enhance its theory of liability for securities fraud.  "In the absence of any identification of how a further amendment would improve upon the Complaint, leave to amend must be denied as futile."  *In re WorldCom, Inc. Sec. Litig.*, 303 F. Supp. 2d 385, 391 (S.D.N.Y. 2004); *see also, e.g.*, *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 622 (2d Cir. 2009) (summary order) ("Granting leave to amend is futile if it appears that plaintiff cannot address the deficiencies identified by the court and allege facts sufficient to support the claim.").  Permitting plaintiff to file a second amended complaint under these circumstances would therefore needlessly burden counsel and the Court, and unhelpfully encourage counsel in future cases to forego earlier opportunities to replead once on notice of the full arguments favoring dismissal.

**CONCLUSION**

For the foregoing reasons, plaintiff has failed to state a claim for securities fraud under §§ 10(b) and 20(a) of the Exchange Act. Defendants' motion to dismiss the Amended Complaint is, therefore, granted. The Clerk of Court is respectfully directed to close the motions pending at docket numbers 38 and 40 and to close this case.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge


Dated: March 29, 2016
       New York, New York